# 22-11011

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

**UNITED STATES OF AMERICA,**
Plaintiff-Appellee

v.

**ERIC PRESCOTT KAY,**
Defendant-Appellant

---

On Appeal from the United States District Court
For the Northern District of Texas
Fort Worth Division
District Court No. 4:20-CR-269-Y

---

**APPELLEE'S BRIEF**

---

Leigha Simonton
United States Attorney

Jonathan Bradshaw
Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
jonathan.bradshaw@usdoj.gov

Attorneys for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary.  Applying its highly deferential standards of review, the Court can readily assess—and reject—Kay's challenges to the sufficiency of the evidence on the briefs and record alone.  The same is true for Kay's challenges to the prosecutors' closing argument.  The record disproves Kay's assertions of prosecutorial error.  And even if there was error, Kay cannot overcome the strong evidence of his guilt.  For these reasons, oral argument is unlikely to substantially assist the Court in resolving this appeal.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ..................................i

TABLE OF AUTHORITIES .......................................................... v

STATEMENT OF JURISDICTION............................................... 1

STATEMENT OF THE ISSUES .................................................. 1

STATEMENT OF THE CASE ...................................................... 1

    1.    Tyler Skaggs is found dead of a drug overdose, and a Texas grand jury charges his long time drug dealer, Eric Kay................ 1

        A.    Kay had been dealing opioids to Skaggs and other players for years ............................................................... 2

        B.    Hours before Skaggs's death, he texted Kay requesting "a few" pills and later texted Kay his hotel room number and told Kay to "come by." ................................................. 4

        C.    After Skaggs's death, Kay tells a series of lies .................... 6

        D.    Medical doctors testify that fentanyl caused Skaggs's death ................................................................. 8

    2.    After Kay is convicted, he expresses no remorse and receives a 264-month sentence .................................................... 9

SUMMARY OF THE ARGUMENT ......................................... 10

ARGUMENT AND AUTHORITIES....................................... 12

    1.    Substantial evidence supported the jury's verdict ...................... 12

        A.    Substantial evidence proved that Kay distributed fentanyl to Skaggs in the Northern District of Texas ...................... 16

            i.    Kay was Skaggs's source for "blues." ....................... 16

ii.  After Skaggs requested pills, Kay met with Smith to fill the order.......................................................... 17

iii. Trial evidence showed that Kay gave Skaggs the blue pill in his Texas hotel room .............................. 19

iv.  That evidence easily proves that Kay distributed fentanyl in North Texas............................................ 24

B.  Three doctors' testimony—and mountains of circumstantial evidence—overwhelmingly supported the jury's finding   that fentanyl was the but for cause of Skaggs's death .................................................. 26

C.  Overwhelming evidence supported the jury's verdict on Count One ...................................................... 31

2.  Kay has failed to show error—let alone reversible error—in the prosecutors' closing arguments.................................. 39

A.  Prosecutors did not misstate the trial evidence.................. 41

i.   The evidence supported a prosecutor's argument that Garet Ramos did not delete text messages from Skaggs's phone after Skaggs's death ........................ 41

ii.  The evidence supported the prosecutor's argument that Kay was Skaggs's only source for blue, 30 miligram oxycodone pills ........................................ 43

iii. The prosecutor accurately characterized the doctors' testimony about the cause of Skaggs's death............ 45

iv.  The prosecutor's argument that Kay was in the room when Skaggs died was a fair inference from the record evidence ...................................... 49

B.  The government did not vouch for its witnesses................ 51

C.  The government made no personal attack on counsel ....... 54

D.    Even if the Court finds error in one or more of the statements, it should affirm ............................................... 57

E.    There was no error, let alone reversible "cumulative error." ............................................................ 58

CONCLUSION ............................................................................ 60

CERTIFICATE OF COMPLIANCE ............................................ 60

# TABLE OF AUTHORITIES

**Federal Cases**                                                          **Page(s)**

*Burrage v. United States*, 571 U.S. 204 (2014) ...................................... 16, 26, 27

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) ........................................... 59

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................... 14, 24

*Puckett v. United States*, 556 U.S. 129 (2009) ................................................. 15

*Smith v. United States*, 143 S. Ct. 1594 (2023) ......................................... 24, 25

*United States v. Aguilar*, 645 F.3d 319 (5th Cir. 2011) ......................... 39, 40, 57

*United States v. Alaniz*, 726 F.3d 586 (5th Cir. 2013) ..................................... 39

*United States v. Andaverde-Tinoco*, 741 F.3d 509 (5th Cir. 2013) ................. 57, 58

*United States v. Asibor*, 109 F.3d 1023 (5th Cir. 1997) ................................... 14

*United States v. Benito*, 835 F. App'x 789 (5th Cir. 2021) ............................... 32

*United States v. Bennett*, 874 F.3d 236 (5th Cir. 2017) ............................... 39, 58

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) .............................. 55, 56

*United States v. Broussard*, 80 F.3d 1025 (5th Cir. 1997) ................................ 38

*United States v. Carreon-Palacio*, 267 F.3d 381 (5th Cir. 2001) .................... 14, 25

*United States v. Crittenden*, 46 F.4th 292 (5th Cir. 2022) ................................ 13

*United States v. Curtis*, 635 F.3d 704 (5th Cir. 2011) ..................................... 38

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) ............................. *passim*

*United States v. Escajeda*, 8 F.4th 423 (5th Cir. 2021) .................................... 36

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) ..................................... 59

**Federal Cases, continued**                                            **Page(s)**

*United States v. Freeman*, 56 F.4th 1024 (5th 2023) ........................ 21, 22, 23, 24

*United States v. Gaspar-Felipe*, 4 F.4th 330 (5th Cir. 2021)..........................23, 29

*United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008) ........................... 51, 53, 54

*United States v. Greenlaw*,  2023 WL 4856259 (5th Cir. July 31, 2023) . 13, 57, 59

*United States v. Gutierrez*, 699 F. App'x 414 (5th Cir. 2017) ............................ 32

*United States v. Huntsberry*, 956 F.3d 270 (5th Cir. 2020) ................................ 14

*United States v. Johnson*, 481 F.2d 645 (5th Cir. 1973) ..................................... 35

*United States v. Jones*, 969 F.3d 192 (5th Cir. 2020) ......................................... 36

*United States v. Lara*, 23 F.4th 459 (5th Cir. 2022)........................ 40, 41, 43, 50

*United States v. Maseratti*, 1 F.3d 330 (5th Cir. 1993) ...................................... 33

*United States v. McCann*, 613 F.3d 486 (5th Cir. 2010).................................... 41

*United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980)................................. 55

*United States v. McDowell*, 498 F.3d 308 (5th Cir. 2007) ................................. 14

*United States v. Mendoza*, 522 F.3d 482 (5th Cir. 2008) ................................... 40

*United States v. Moreno-Gonzalez*, 662 F.3d 369 (5th Cir. 2011) ............ 13, 14, 25

*United States v. Munoz*, 150 F.3d 401 (5th Cir. 1998)...................................... 50

*United States v. Neal Uy Lim*, 500 F. App'x 323 (5th Cir. 2012)....................... 56

*United States v. Parker*, 505 F.3d 323 (5th Cir. 2007)....................................... 29

*United States v. Pedroza*, 78 F.3d 179 (5th Cir. 1996)....................................... 32

vi

**Federal Cases, continued**                                              **Page(s)**

*United States v. Phillips*, 477 F.3d 215 (5th Cir. 2007) ...................................... 15

*United States v. Rodriguez*, 831 F.3d 663 (5th Cir. 2016)............................17, 31

*United States v. Rodriguez-Parra*, 581 F.3d 227 (5th Cir. 2009)........................ 52

*United States v. Romans*, 823 F.3d 299 (5th Cir. 2016) ................................... 37

*United States v. Shabani*, 513 U.S. 10 (1994).................................................... 34

*United States v. Solis*, 299 F.3d 420 (5th Cir. 2002) ......................................... 37

*United States v. Sotelo*, 97 F.3d 782 (5th Cir. 1996) ......................................... 16

*United States v. Staggers*, 961 F.3d 745 (5th Cir. 2020) ..............................12, 13

*United States v. Stanford*, 823 F.3d 814 (5th Cir. 2016)................................... 58

*United States v. Swenson*, 25 F.4th 309 (5th Cir. 2022) ................................... 13

*United States v. Tenorio*, 360 F.3d 491 (5th Cir. 2004)...............................19, 32

*United States v. Thomas*, 690 F.3d 358 (5th Cir. 2012) ................................... 37

*United States v. Thompson*, 945 F.3d 340 (5th Cir. 2019)................................. 30

*United States v. Valas*, 822 F.3d 228 (5th Cir. 2016)........................................ 55

*United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014)......... 19, 24, 25, 31

*United States v. Virgen-Moreno*, 265 F.3d 276 (5th Cir. 2001).......................... 39

*United States v. Wiseman*, 576 F. App'x 376 (5th Cir. 2014)............................ 36

*United States v. Yusuf*, 57 F.4th 440 (5th Cir. 2023) ........................................ 15

## Federal Statutes and Rules                                        Page(s)

18 U.S.C. § 3231 ........................................................................ 1

21 U.S.C. § 841(a)(1) ............................................................... 26

21 U.S.C. § 841(b)(1)(C) .......................................................... 26

21 U.S.C. § 846 ......................................................................... 1

28 U.S.C. § 1291 ....................................................................... 1

Fed. R. App. P. 4(b)(1)(A)(i) ................................................... 1

## STATEMENT OF JURISDICTION

This is a direct appeal from a criminal conviction. The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291. Judgment was entered on October 12, 2022, and Kay timely noticed his appeal the next day. (ROA.24, 1059, 1064.) *See* Fed. R. App. P. 4(b)(1)(A)(i).

## STATEMENT OF THE ISSUES

1.     A jury found that Kay distributed the fentanyl that caused Skaggs's death and conspired to traffic opioids. Did the evidence support the verdict, or is the record, in certain respects, devoid of evidence?

2.     A defendant faces a high bar when seeking a new trial based on the prosecutors' closing arguments. Has Kay cleared that bar where he has failed to show any error?

## STATEMENT OF THE CASE

**1.     Tyler Skaggs is found dead of a drug overdose, and a Texas grand jury charges his long-time drug dealer, Eric Kay.**

On July 1, 2019, Skaggs, a starting pitcher for the Los Angeles Angels, was found dead of a suspected overdose in his hotel room in Southlake, Texas. (ROA.3824-26, 4772.)

A federal grand jury charged Eric Kay with (1) conspiracy to possess with the intent to distribute a controlled substance, in violation of 21 U.S.C.

§ 846, and (2) distribution of a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (ROA.563-64.) At Kay's trial, the jury heard from more than three dozen witnesses and saw hundreds of pages of exhibits. That evidence established the following.

### A. Kay had been dealing opioids to Skaggs and other players for years.

Eric Kay worked in communications for the Angels. (ROA.4655.) Kay was addicted to 30-miligram oxycodone pills (and their fentanyl-pressed counterfeits); despite two stints in drug rehab, Kay often asked dealers to deliver him pills at Angels' Stadium via the website OfferUp. (ROA.3799, 4789-4805, 4931; GX 136-38.)

Kay did not just abuse these pills, he sold them to professional baseball players. At trial, five players testified that Kay sold them "blues"—*i.e.*, blue, 30-miligram oxycodone pills. (ROA.4971 (CJ Cron); ROA.4992 (Michael Morin); ROA.5010-11 (Cameron Bedrosian); ROA.5244 (Blake Parker); ROA.4933-34 (Matthew Harvey).) The pills came from Kay directly or from Kay via Skaggs. (ROA.4924-25, 4971-76.) Kay's text messages were admitted at trial and corroborated the players' testimony. (GX 17, 19.) For example, Morin explained a text message in which Kay urged Morin and Skaggs to buy 50 such pills for more than $1,000. (ROA.4993.)

**Can get 50 at $22 per. So 1,100. I would jump on this. Has to be 50 tho**
Status: Read
Read: 6/1/2017 6:23:05 PM(UTC+0)

6/1/2017 6:22:00 PM(UTC+0)

(GX 17.)  Skaggs declined, writing that he could "barely contain" himself with

three.  (GX 17.)  Weeks later, Kay texted Skaggs and Morin again, urging

them to buy "a good amount" so they could "hold for a while."



**Hey cocks. How many rockets u want? 30 per and will have Sunday evening. I would recommend buying a good amount to hold for a while**
Status: Read
Read: 7/8/2017 11:46:08 PM(UTC+0)

7/8/2017 11:42:54 PM(UTC+0)

(GX 19.)  Morin explained that Kay was urging them to buy 30-miligram

oxycodone, not literal "rockets."  (ROA.4995.)

Kay was these players' exclusive source for "blues."  (*E.g.*, ROA.4971,

4994.)  Although Matthew Harvey testified that he sourced pink, low-grade

oxycodone from a friend and shared some of those pills with Skaggs, Harvey

got his "blues" from Skaggs via Kay.  (ROA.4922-27.)  Cron stopped buying

the blue pills after he was traded to Tampa Bay—except once when his new

team travelled to play the Angels.  (ROA.4972-74.)  Before the trip, Cron

asked Kay to get him oxycodone.  (ROA.4973.)  Cron later gave Kay cash, and Skaggs delivered the pills to Cron's hotel room.  (ROA.4973-74.)

Skaggs's childhood friend, Chris Leanos, testified that Skaggs asked him only one time if Leanos had a source for "blues."  (ROA.4729-30.)  That was over text message a "week or two" before Skaggs's death.  (ROA.4730.)  Leanos told Skaggs "I don't know nobody.  Don't mess with those.  They are bad.  Most people say they are fake."  (ROA.4730.)  Leanos testified that, after showing the text message to a member of Skaggs's family, Leanos deleted it from his phone.  (ROA.4731.)

### B.    Hours before Skaggs's death, he texted Kay requesting "a few" pills and later texted Kay his hotel room number and told Kay to "come by."

On June 30, 2019, the day before Skaggs was found dead in his Texas hotel room, the Angels played a home game at Angels' Stadium and then flew to Dallas.  (ROA.3695.)  Kay had recently returned to work after drug rehab.  (ROA.4931.)  At 12:35 p.m., Kay texted Skaggs, asking "Ho[w] many?"  (GX 15, 176.)  Skaggs replied, "[j]ust a few like 5," "[d]on't need many."  (GX 15.)

Kay, in turn, contacted one of his drug sources, "Ashley Smith."  (*See* GX 161; ROA.2946 (showing that Smith and Kay texted more than a dozen times after Skaggs requested pills).)  "Ashley Smith" was a fake name that, along with a fake address, was used to get a burner phone.  (ROA.4828-29.)

Cell-tower records from that day showed frequent communications between Kay and "Smith" and "her" phone pinging a tower "three, maybe three-and-a-half miles" from Angels' stadium. (ROA.4520-22; GX 161.) The records also showed a 40-minute gap during which "she" could travel the few miles to Angels' Stadium to meet Kay. (GX 161; ROA.2946, 4521-22.)

Thereafter, Kay ran into Matt Harvey at the stadium. (ROA.4933.) They discussed Kay giving Harvey a "blue oxycodone" pill. (ROA.4933.) Kay left the pill in Harvey's locker and later boarded the plane for Texas, his first road trip since returning from drug rehab. (ROA.3676, 3786, 4931-34.)

The team flew to DFW and then bussed to the Hilton hotel in Southlake, Texas. (ROA.3820-22.) The players, including Skaggs, and the staff, including Kay, were on different busses. (ROA.3785, 3788.) On the players' bus, Skaggs was standing at the front, "emceeing, doing the music." (ROA.3699-3700.)

The busses arrived at the hotel after 11:00 p.m. (ROA.3788, 4605.) Hotel staff had already put the team's room keys on a table for pickup. (ROA.4604.) Kay was staying in Room 367, Skaggs in Room 469. (ROA.4608-10.) Kay retrieved his room key from the table and—according to the hotel's key-card records—used it to access his room at 11:39 p.m. (ROA.4618-19.) Skaggs used his key to open Room 469 at 11:43 p.m.

(ROA.4624.)  He snapped a picture of himself at 11:46 p.m. and, one minute later, texted Kay his room number and told Kay to "[c]ome by."  (GX 15, 17, 176.)  Three minutes later, Kay replied: "K."  (GX 15, 176.)

By 12:02 a.m., Skaggs was no longer responding to text messages from his wife, which was "very odd" for him.  (GX 176; ROA.5096-97.)  Later that day, he was found dead—lying face down, inches from his phone, still wearing his jeans and boots.  (ROA.3824-26, 5686, 5697; GX 95.)  Skaggs had snorted a blue pill in which the only controlled substance was fentanyl and suffered a "rapid death."  (ROA.5048, 5717-28; GX 95, 107, 120.)

**C.    After Skaggs's death, Kay tells a series of lies.**

Almost immediately, police suspected an overdose given the "hollowed-out pen and white residue on the counter indicating drug use." (ROA.4772.)  Police then gathered the Angels' players and staff for interviews. (ROA.4772.)  Kay was "withdrawn" and "seemed off" to one officer. (ROA.4774.)  And Kay lied throughout his interview.  (ROA.4774; GX 110.) First, Kay told officers that the last time he saw Skaggs was when everyone was "getting our keys."  (GX 110.)  Second, when police asked Kay if he knew Skaggs to use drugs, Kay said only marijuana.  (GX 110.)

Hours later, the Angels sent out a press release stating that Skaggs had passed away. (ROA.4664-65.) Smith soon dropped her burner phone and got a new one. (GX 47.) She then texted Kay. (ROA.4541.)

Thereafter, Harvey joined the team in Texas. (ROA.4938.) He talked to Kay, who seemed "very on edge" and "nervous." (ROA.4938.) Kay told Harvey something about "staying together." (ROA.4939.) Harvey, who had given Skaggs pink pills, assumed that Kay had given Skaggs blue pills—like the one he left in Harvey's locker before the road trip. (ROA.4939.)

On July 2, 2019, Kay told Adam Chodzko, another Angels employee, that he had heard Skaggs "choked to death on some gummy bears." (ROA.4667.) Several weeks later, Kay told Chodzko a more elaborate story about the night of Skaggs's death. Specifically, the day after a game played in Skaggs's honor, Kay was apparently abusing opioids at Angels' Stadium.[1] (*See* ROA.4670-72.) Chodzko offered to drive Kay home because he was in no shape to drive. (ROA.4672.) On the drive, Kay told Chodzko:

> [T]he night that we arrived in Texas, the night before Tyler passed away, Tyler was texting him to come over to his hotel room. And Eric said he said, no, at first, and then after he went and picked up his luggage from downstairs, he said he was going to come over.

---

[1] Kay, acting erratic and sweating through his shirt, told Chodzko that his cold medications were interfering with other medications. (ROA.4670, 72.) A later search of Kay's office recovered a razor blade that tested positive for oxycodone. (ROA.4711, 4821.)

He said he went over to Tyler's room and went in the room and Tyler had three lines of opiates on the hotel menu, and Tyler told him, one of these lines is for you. Eric said he told Tyler, hey, I'm trying to get sober. I'm on some meds that won't allow me to even feel like I get high anymore. So, he said he watched Tyler do the three lines.

(ROA.4672-73.)

Meanwhile, Kay continued to source blue pills after Skaggs's death, though he became scared of the pills with "fetty pressed in 'em." (ROA.4789.)

### D.    Medical doctors testify that fentanyl caused Skaggs's death.

Dr. Marc Krouse prepared Skaggs's autopsy report, concluding that the cause of death was "[m]ixed ethanol, fentanyl, and oxycodone intoxication with terminal aspiration of gastric contents." (ROA.4226-27.) As Dr. Krouse explained at trial, while he could not completely "eliminate" to "a medical certainty" the possibility that Skaggs would have died without ingesting fentanyl, his ingestion of fentanyl made his death "[a] much greater probability." (ROA.4250.)

Dr. Richard Fries, the Deputy Medical Examiner at the Tarrant County Medical Examiner's Office, participated in the Critical Case Review of Skaggs's autopsy. (ROA.4324, 4327.) Dr. Fries testified that fentanyl was the but-for cause of Skaggs's death. (ROA.4341.) He explained that though Skaggs also ingested oxycodone and alcohol, his oxycodone levels were "therapeutic," and his alcohol level was ".1"—a level commonly seen in

8

people "walking around." (ROA.4340-41.) Thus, Dr. Fries would not expect those two substances alone to have caused Skaggs's death. (ROA.4341.)

Dr. Stacy Hail reached the same conclusion. Dr. Hail is a medical toxicologist who reviewed Skaggs's medical and autopsy records, police reports, and photographs from the crime scene. (ROA.5026-29, 5040-42, 5050.) She testified that, for Skaggs, the "but-for cause of death is fentanyl." (ROA.5049, 5051.) In other words, had Skaggs ingested alcohol and oxycodone, but not fentanyl, he would have lived. (ROA.5052.)

## 2.    After Kay is convicted, he expresses no remorse and receives a 264-month sentence.

The jury found Kay guilty and further found that his fentanyl caused Skaggs's death. (ROA.954-55.) That finding required a mandatory-minimum penalty of 20 years' imprisonment and a potential maximum sentence of life. (*See* ROA.3013.) Kay's PSR calculated an advisory guideline range of 235 to 293 months' imprisonment, and the government advocated for a top-of-the-range sentence because Kay showed no remorse for killing Skaggs. (ROA.3013, 3466-76.) Rather, Kay blamed the prosecutors, denigrating them in post-trial correspondence as "bitches" and a "cunty fed with horrible makeup." (ROA.3448, 3479, 3481.) He further blamed the jurors, calling them "fat, sloppy, toothless and unemployed." (ROA.3482.) And he blamed Skaggs, who Kay branded as a "menace" and a "piece of shit." (*See*

ROA.3435-36 (citing recordings of Kay's jail calls); *see also* ROA.5389.)  At

sentencing, the district court asked Kay about one statement in particular:

"You said: I hope people realize what a piece of you-know-what Skaggs is.

Well, he's dead, so F him." (ROA.5389.)  After hearing Kay's explanation,

and reviewing his post-trial statements, the court found that Kay was "callous"

and "refus[ed] to accept responsibility and even be remorseful for something

that [he] caused." (ROA.5411-13.)  It sentenced Kay to 264 months.

(ROA.5411-13.)

This appeal follows.

## SUMMARY OF THE ARGUMENT

1.    The evidence against Kay was strong on both counts.  Start with

Count Two.  The evidence showed that Kay went to Skaggs's hotel room and

delivered the fentanyl that killed him.  The verdict rests soundly on Kay's

incriminating text messages with Skaggs, contacts with Ashley Smith, lies to

the police investigating Skaggs's death, Kay's suspicious behavior, and Kay

and Smith's maneuvers to avoid getting caught after Skaggs's death.  From

that damning evidence (and more), any rational juror could find Kay guilty on

Count Two.  The jury's additional finding—that Skaggs's death resulted from

Kay's fentanyl—also rested on ample evidence, including the testimony of

Doctors Hail and Fries, who testified that fentanyl killed Skaggs.

Substantial evidence also supported the jury's finding that Kay conspired to violate the narcotics laws as charged in Count One. The jury saw Venmo records, cell tower records, and cellphone records proving that Kay conspired with Smith, Hector Vasquez, Shannon Diaz, and others to source opioids for distribution to Angels' players. And the jury heard from at least five players who admitted to buying blue pills from Kay. Kay's arguments otherwise—that no one profited, he is sheltered under this Court's "buyer-seller" exception, and the government failed to prove venue—suffer many fundamental flaws. Although evidence showed that Kay profited, an unprofitable distributor is not immune from prosecution. Additionally, Kay was a prolific mid-level distributor—regularly purchasing pills from upstream suppliers and then reselling them to Skaggs, who redistributed some, and to other players—so he simply cannot fit himself within this Circuit's limited buyer-seller exception. And venue was proper because, as the evidence allowed the jury to find, Kay's distribution and acts of concealment occurred in north Texas.

2.    The government did not make improper statements in its closing arguments. Kay complains that the government misstated the evidence four times, but he is wrong as to each. The government's arguments were proper characterizations of the evidence and the reasonable inferences drawn therefrom. Kay's complaint that the government vouched for its witnesses—

11

the players who testified Kay sold them blue pills—is also meritless.  It

misreads the record and ignores the fact that Kay himself also called a player

to so testify and conceded at trial (and again on appeal) that he sourced pills

for players.  For those reasons, he comes nowhere close to showing reversible,

plain error.  Finally, Kay is wrong that the prosecutor attacked his counsel.

Rather, she attacked counsel's *arguments*, a strategy that this Court has

repeatedly held permissible.  This Court should affirm.

## ARGUMENT AND AUTHORITIES

### 1.    Substantial evidence supported the jury's verdict.

#### Standard of Review

At the close of evidence, and again in writing after trial, Kay moved for a

judgment of acquittal.  (ROA.5276-77 (motion at trial); (ROA.982-83

(post-trial motion).)  But Kay's motion was specific, not general.  *See United

States v. Staggers*, 961 F.3d 745, 754 (5th Cir. 2020) (explaining that where a

defendant makes "general objections to the sufficiency of the evidence," review

is de novo).

As to Count Two, he argued only that the evidence failed to show

(1) venue and (2) that fentanyl was the but-for cause of Skaggs's death.

(ROA.983, 5276.)  As to Count One, he challenged only the evidence

establishing venue.  (ROA.983, 5276); Br. at 41 (conceding that he did not

preserve his conduct-based arguments below).)  Therefore, two standards of review apply to Kay's sufficiency challenges.

First, this Court reviews de novo Kay's preserved arguments that (1) the evidence was insufficient to sustain the jury's venue and death-results findings on Count Two, and (2) its venue finding on Count One.  *See Staggers*, 961 F.3d at 754.

Although review on these claims is de novo, it is also "quite limited," *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (en banc) (internal quotation marks omitted), and "highly deferential to the verdict," *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011) (internal quotation marks omitted).  "The jury's constitutional role in deciding criminal trials leaves little room for judicial second-guessing." *Crittenden*, 46 F.4th at 296.  "That means, rather than 'reweigh the evidence,' [this Court] 'search[es] the record for evidence to support the convictions beyond a reasonable doubt.'" *United States v. Greenlaw*, No. 22-10511, ___ F.4th ___, 2023 WL 4856259, at *3 (5th Cir. July 31, 2023) (quoting *United States v. Swenson*, 25 F.4th 309, 316 (5th Cir. 2022)).

With respect to the death-results finding, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

the . . . element[] . . . beyond a reasonable doubt.'" *Moreno-Gonzalez*, 662 F.3d at 372 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). As for venue, the record is still viewed favorably to the verdict but need only establish it by a much-lower standard—preponderance of the evidence. *United States v. Carreon-Palacio*, 267 F.3d 381, 391 (5th Cir. 2001).

Even applying de novo review, this Court "accept[s] all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997). The inquiry is limited to whether the jury's verdict was reasonable, not whether this Court believes it to be correct. *See Moreno-Gonzalez*, 662 F.3d at 372. Finally, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt," and "any conflict in the evidence must be resolved in favor of the jury's verdict." *Moreno-Gonzalez*, 662 F.3d at 372 (internal quotation marks and citations omitted).

Second, Kay's unpreserved arguments about the sufficiency of the evidence on the elements of Counts One and Two are reviewed only for plain error. *United States v. McDowell*, 498 F.3d 308, 312-13 (5th Cir. 2007); *see also United States v. Huntsberry*, 956 F.3d 270, 282 (5th Cir. 2020) (applying plain-error review where a sufficiency objection below was on a different basis than

14

the argument presented on appeal); *United States v. Phillips*, 477 F.3d 215, 219

(5th Cir. 2007). "Meeting all four prongs of plain-error review is 'difficult, as it

should be.'" *United States v. Yusuf*, 57 F.4th 440, 445 (5th Cir. 2023) (quoting

*Puckett v. United States*, 556 U.S. 129, 135 (2009)).

"But where, as here, the unpreserved claim is a

sufficiency-of-the-evidence challenge, the standard of review is doubly

difficult." *Id.* That is "because the 'substantial deference' that [this Court]

generally afford[s] verdicts combines with the 'exacting' plain-error standard to

create an exponentially more difficult standard of review than either one

standing alone." *Id.* Kay can prevail only if "the record is *devoid of evidence*

pointing to guilt." *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012)

(en banc) (internal quotation marks omitted). "These combined standards are

tantamount to the eye of a virtually impassable needle." *Yusuf*, 57 F.4th at

445.

## Discussion

Ample evidence supported the jury's verdict that Kay distributed

fentanyl to Skaggs in the Northern District of Texas and the jury's finding that

Skaggs's death resulted from that fentanyl. Kay's arguments to the contrary

fail to credit the jury's reasonable inferences, ignore substantial evidence, and

contravene the standard of appellate review. This Court should affirm.

15

### A.    Substantial evidence proved that Kay distributed fentanyl to Skaggs in the Northern District of Texas.

Title 21 U.S.C. § 841(a) prohibits unauthorized distribution of a controlled substance. *Burrage v. United States*, 571 U.S. 204, 209 (2014). To sustain a conviction under that Section, "the Government must prove that the defendant (1) knowingly (2) distributed (3) the controlled substance." *United States v. Sotelo*, 97 F.3d 782, 789 (5th Cir. 1996).

The evidence at Kay's trial established the following facts: (1) Kay was Skaggs's source for blue, 30-miligram oxycodone pills; (2) Skaggs requested these pills from Kay hours before he died; (3) Kay subsequently met with Smith to buy pills; (4) Kay flew to Texas and gave pills Skaggs at the hotel; and (5) Skaggs died from snorting one. Below, the government addresses the trial evidence supporting each of those facts.

### i.    Kay was Skaggs's source for "blues."

Substantial evidence proved that Kay dealt opioids—specifically, pharmacy-grade, blue, 30-miligram oxycodone pills and counterfeits of same pressed from fentanyl—to numerous Angels' players, including Skaggs. (*E.g.*, GX 17 & 19; ROA.5243-44.) Kay conceded as much at trial, (ROA.5322), and so concedes on appeal, (Br. at 12).

16

### ii.    After Skaggs requested pills, Kay met with Smith to fill the order.

The evidence showed that, consistent with their years-long practice, Skaggs sought to buy pills from Kay on June 30.  Kay asked Skaggs by text message, "ho[w] many?"  (GX 15.)  Skaggs replied, "Just a few like 5."  (GX 15.)  Kay is correct to concede that these messages show Skaggs requesting pills from Kay.  (Br. at 32.)

After receiving Skaggs's order for pills, Kay met with Smith to get them.  At least five pieces of evidence support that conclusion.  *First*, shortly after Skaggs said he needed a few pills, Kay exchanged a flurry of text messages with Smith.  (*See* GX 161; ROA.2946.)  That pattern was consistent with the fact that Smith was one person to whom Kay went for drugs.  (ROA.4828, 5124-26.)  As former DEA investigator Herkert testified, that evidence indicated that Smith was Kay's "source of supply."  (ROA.5126.)

*Second*, "Ashley Smith" was a fake name used to obtain a burner phone.  (ROA.4544, 4829.)  As Special Agent Sedwick testified, drug traffickers commonly use "fake names" and "burner phones."  (ROA.4544); *see also United States v. Rodriguez*, 831 F.3d 663, 666 (5th Cir. 2016) (listing burner phones among the items indicative of drug distribution).

*Third*, Smith's cell-tower records showed her phone pinging off a tower less than four miles from the stadium.  (GX 161; ROA.2946, 4521, 4554.)  Kay

was at the stadium, where he had a history of asking suppliers to bring him pills.  (ROA.4791, 4802 (Kay asking two different drug dealers to bring 30-miligram oxycodone pills to him at Angels' Stadium).)  Those records also showed a 40-minute gap in communication, during which Smith could have easily travelled the few miles to meet up with Kay.  (GX 161; ROA.2946, 4521-22.)  There certainly were no subsequent communications indicating that they were unable to meet or complete a transaction.

*Fourth*, *after* the time in which Kay would have met with Smith, Kay put a blue pill in Harvey's locker.  (ROA.4933-34.)

*Fifth*, the jury saw how Smith reacted after word of Skaggs's death reached California.  Just hours after a press release announced Skaggs's death, (ROA.4664-66), Smith deactivated the burner phone on which she had talked to Kay and contacted him, in Texas, using a new number, (GX 47; ROA.4525-26).  As Special Agent Sedwick testified, dropping a burner phone is "very common" in the "dope world."  (ROA.4526.)  If someone "think[s their] phone has been burned or it's hot," they will "just drop the phone." (ROA.4526.)

The jury was well equipped from this evidence to find that Skaggs ordered pills from Kay, that Kay procured a supply from Smith and gave one of them to Harvey, and he kept others to fulfill Skaggs's request.

### iii.    Trial evidence showed that Kay gave Skaggs the blue pill in his Texas hotel room.

Once Kay and Skaggs arrived at the hotel in Texas, both found their room keys and used them to access their rooms.  (GX 176; ROA.4618-24.)  Minutes later, Kay received a text message from Skaggs with his room number and instructions to come by.  (GX 15.)  Kay agreed, and Skaggs was found dead the next day from a fentanyl overdose.  From that series of events, a rational juror could conclude that Skaggs was asking Kay to bring the requested pills to Room 469, and that Kay did so shortly before Skaggs snorted one and died.  This is certainly not a record "devoid" of evidence of Kay's guilt.  As this Court has explained: numerous, seemingly innocent circumstances can "by their number and joint operation" combine to "constitute conclusive proof" of guilt.  *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (internal quotation marks omitted).  That is the case here.

Moreover, the jury's verdict was buttressed by the evidence of Kay's lying, deflection, and attempts to cover his tracks during the investigation into Skaggs's death.  Such "affirmative false explanation[s] for [a] defendant's behavior can be evidence of guilt."  *United States v. Tenorio*, 360 F.3d 491, 495 (5th Cir. 2004).

*First*, Kay lied to police, claiming that he only knew Skaggs to use marijuana and had not seen him since they picked up their room keys from the table. (GX 110; *see also* ROA.4774.) Kay withheld that he had been selling Skaggs "blues" for years, that Skaggs had asked for a "few" pills hours before his death and directed Kay to come by Room 469, and that Kay had done so.

*Second*, Kay told Chodzko a series of increasingly outlandish stories. On July 2, Kay's story was that Skaggs "choked to death on some gummy bears." (ROA.4667.) Then, after Kay apparently abused opioids at work the day after Skaggs's memorial game, Kay told Chodzko that Skaggs invited Kay up to Room 469 to snort drugs provided by Skaggs. (ROA.4672-73.) Neither story was credible. As to the latter, the jury heard testimony that Skaggs and Kay were not known to socialize together. Skaggs's mother had never heard of Eric Kay, and Skaggs's wife did not know them to hang out outside of work. (ROA.3882, 5094-95.) Moreover, by this version of Kay's story, he was in Skaggs's room, contrary to his recorded statements to police, and Skaggs was trying to give Kay drugs, contrary to their years-long arrangement.

Altogether, the jury heard Kay's (at least) four different stories: (1) that he had not seen Skaggs since they picked up their keys, (GX 110); (2) that Skaggs had choked to death on gummy bears, (ROA.4667); (3) Skaggs invited him to his room but Kay initially said no, (ROA.4672-73); and (4) Kay went to

Skaggs's room, where he had lines of opiates already laid out on a hotel menu when Kay arrived, (ROA.4672-73). Kay's stories could not all be true—and some were demonstrably false. But the fact that Kay lied about the events further allowed the jury to conclude that the facts were as the government showed: Kay went to Room 469 and handed Skaggs the pills that Skaggs had ordered from him.

Kay's interactions with Harvey further support the jury's verdict. By the time Harvey got to Dallas, Kay was "very on edge" and seemed "nervous." (ROA.4938-39.) Kay then told Harvey "something about staying together." (ROA.4939.) Harvey assumed that Kay must have been referencing the fact that both men had given Skaggs drugs. (ROA.4939.)

All of that is strong circumstantial evidence of Kay's guilt on Count One. This Court has "easily" affirmed a jury's verdict on less damning circumstantial evidence. *See United States v. Freeman*, 56 F.4th 1024, 1026 (5th 2023). In *Freeman*, a case about firearm possession, the government presented "no direct evidence of possession." *Id.* But the jury could still "easily infer" Freeman's guilt in light of (1) video showing him running from police and testimony that those who flee often have guns or drugs, (2) evidence that the gun was recovered within 20 feet of Freeman's flight path, in an area rarely traversed, and (3) circumstantial evidence that the gun was not in the field

21

where it was found during an earlier storm. *Id.* As this Court explained, "[t]he sufficiency standard remains the same whether the evidence is direct or circumstantial." *Id.* at 1025. This Court must affirm if *any* rational juror could have found the defendant guilty. *Id.*

Here, this record provides numerous avenues upon which a rational jury could find that Kay supplied Skaggs with the fatal pill in Texas. The acknowledged relationship—Kay was Skaggs's source for "blues." The chronology—Skaggs requested pills from Kay, Kay promised to deliver (consistent with their longstanding arrangement), Kay met with his supplier and delivered a pill to Harvey, then met with Skaggs in his hotel room in Texas, where he delivered the requested pills. Kay's false stories exculpating himself—telling police he never saw Skaggs after getting his room key, saying to Chodzko that Skaggs died from choking on gummy bears, and then saying later he was in Skaggs's room where Skaggs offered him drugs. And Kay's demeanor after Skaggs's death—his nervousness and apparent appeal to another of his drug users that they should stick together during the investigation. This evidence combined to strongly support the jury's verdict, and this Court should affirm.

 On appeal, Kay does nothing to rebut all the substantial evidence of his guilt.  Instead, he recycles his rejected arguments that the jury should have a reasonable doubt.  The government addresses them below.

Kay claims that the cell-tower records do not conclusively put Smith at the ballpark, so maybe she never met him.  (Br. at 33.)  Given that Smith dropped her phone just hours after word spread of Skaggs's death in a different state, the jury could conclude that she was Kay's source.

Kay claims that a jury could only speculate that he delivered drugs to Skaggs.  (Br. at 34.)  Maybe "Skaggs offered [*Kay*] a crushed up line."  (*Id.*)  As discussed, Kay's many lies were inherently contradictory and self-defeating.  In any event, the jury was free to reject them all in favor of the strong circumstantial evidence that Kay delivered fentanyl to Skaggs.

Kay claims that maybe Harvey, Leanos, or Rebecca Schoeny were the source of the fatal fentanyl.  (Br. at 35.)  But Leanos and Schoeny denied selling oxycodone to Skaggs (or anyone else), (ROA.4647, 4729-30), and Harvey testified that the pills he gave Skaggs were pink, (ROA.4926-27).  Those pink pills were authentic, low-dose oxycodone, (ROA.4479) not like the fentanyl counterfeit that killed Skaggs, (*see* ROA.4477).  It was the jury's province—not Kay's—to decide whether those witnesses were credible.  *United States v. Gaspar-Felipe*, 4 F.4th 330, 341 (5th Cir. 2021).

23

Kay claims that maybe Hector Vasquez met Skaggs at Angels' Stadium that day—or maybe another source met with Skaggs in Texas. (Br. at 36.) But there is no record evidence of such a meeting and, in any event, the jury was free to reject those theories and credit all of the substantial record evidence showing Kay's guilt. To the extent that Kay suggests strong circumstantial evidence alone is insufficient, he is wrong as a matter of law. *Freeman*, 56 F.4th at 1025.

All of Kay's theories both ignore substantial evidence—like that set out above—and ask this Court to reweigh the evidence in *his* favor and reach conclusions rejected by the jury. Caselaw from the Supreme Court and this Court makes clear the impropriety of Kay's request. *E.g.*, *Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (citing *Jackson*, 443 U.S. at 319). Because this record contains strong evidence of Kay's guilt, especially when viewed in favor of the verdict, this Court should affirm.

### iv.   That evidence easily proves that Kay distributed fentanyl in North Texas.

Kay argues that the government failed to prove venue within the Northern District of Texas, so this Court must acquit him. (Br. 38-40, 49.)

Not so.[2]  The trial evidence, discussed above, established that Kay distributed

fentanyl in north Texas.

The Constitution's Venue Clause requires trial in the States where the

Crime was committed.  *Smith v. United States*, 143 S. Ct. 1594, 1602-03 (2023)

(citing U.S. Const. Art. III, § 2, cl. 3.)  Unlike traditional elements of a

criminal offense, the government need only prove venue by a preponderance of

the evidence, not beyond a reasonable doubt.  *Carreon-Palacio*, 267 F.3d at 391.

Here, the jury was instructed that it must acquit Kay unless the

government established venue—i.e., "that it is more likely than not that the

distribution took place in the Fort Worth division of the Northern District of

Texas."  (ROA.951.)  The jury so found, (ROA.954), and the evidence

discussed in detail above supports the conclusion that Kay delivered the

fentanyl pill at the Southlake hotel, (*supra* Part 1.A.iii-iv).

Kay argues that the evidence also allowed room for the conclusion that

he gave Skaggs pills in California, where he deposited a pill in Harvey's locker.

(Br. at 39-40.)  But, as this Court has recognized, the evidence need not

"exclude every reasonable hypothesis of innocence or be wholly inconsistent

with every conclusion except that of guilt."  *Moreno-Gonzalez*, 662 F.3d at 372

---

[2] The remedy for a violation of the Venue Clause is not acquittal but retrial in the proper venue. *Smith v. United States*, 143 S. Ct. 1594, 1604 (2023).  No retrial is required here, however, because the evidence supported the jury's verdict.

(internal quotation marks and citations omitted). Here, the jury rejected those very arguments. (*See* ROA.5334.) Because the record evidence—particularly when viewed in the light most favorable to the verdict—amply supports it, this Court must affirm. *See Vargas-Ocampo*, 747 F.3d at 303.

### B.     Three doctors' testimony—and mountains of circumstantial evidence—overwhelmingly supported the jury's finding that fentanyl was the but-for cause of Skaggs's death.

Kay also challenges the jury's finding that Skaggs's death resulted from Kay's fentanyl. (Br. at 37-38.) But—as Kay admits, (Br. at 37)—Doctors Hail and Fries testified that fentanyl was the but-for cause of Skaggs's death, and Dr. Krouse testified that the fentanyl greatly increased the chances of Skaggs's death. That testimony, especially coupled with the circumstances surrounding Skaggs's "rapid death," amply supports the jury's finding.

21 U.S.C. § 841 makes it "unlawful for any person knowingly or intentionally to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1). Where the controlled substance is in Schedule I or II (i.e., the types of drugs defined as the most dangerous and addictive), as fentanyl is, the statute provides for a sentence of not more than 20 years for smaller distributions. 21 U.S.C. § 841(b)(1)(C); *Burrage*, 571 U.S. at 209. However, "if death or serious bodily injury results from the use of such substance," the statute provides that the defendant "shall be sentenced to a

term of not less than twenty years or more than life."

21 U.S.C. § 841(b)(1)(C).

In *Burrage*, the Supreme Court held that Section 841's "results from" language imposes "a requirement of actual causality." 571 U.S. at 211. "In the usual course," the Court explained, "this requires proof that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* (internal quotation marks omitted). For example, "where A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died." *Id.* "The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back." *Id.* "Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." *Id.*

Here, the evidence proved that Skaggs ingested fentanyl. (ROA.4331-32, 4435-37, 4441; GX 118, 119.) And both the testimonial and circumstantial evidence supported the jury's finding that the fentanyl was a but-for cause of Skaggs's death. (*See* ROA.951, 954-55.)

27

Both Drs. Fries and Hail testified that fentanyl was the but-for cause of Skaggs's death. (ROA.5052, 5350.) Kay attempts to muddy the clarity of Hail's testimony, claiming that on cross-examination she admitted that she could not be sure if Skaggs could have died from alcohol and oxycodone alone. (Br. at 38.) But, given the chance to explain her answer on re-direct, Dr. Hail made clear that she was simply acknowledging that oxycodone combined with alcohol can kill a person. (ROA.5075-76.) That hypothetical possibility, however, did not change her opinion in *this* case. Dr. Hail made her opinion clear for the jury: "fentanyl is what caused Tyler Skaggs' death." (ROA.5076.) The jury was free, of course, to credit that testimony, which supports the verdict.

Nor is there merit to Kay's reliance on the testimony of Drs. Krouse and Johnson. (Br. at 37.) Neither witnesses' testimony helps Kay, let alone creates a basis for setting aside the jury's verdict. Dr. Krouse testified that, while he could not completely "eliminate" to "a medical certainty" the possibility that Skaggs would have died without ingesting fentanyl, his ingestion of fentanyl made his death "[a] much greater probability." (ROA.4250.) For his part, Dr. Johnson—who is not a medical doctor—would not say "to a medical certainty that oxycodone plus alcohol could not have killed Tyler Skaggs" because, as Dr. Johnson told the jury, "that would be outside of my area" of expertise.

(ROA.4449.) But Dr. Johnson did testify that, from a "tox perspective," one of the substances found in Skaggs's body proved "much more significant." (ROA.4445.) That substance "would be the fentanyl," because the oxycodone was at a low concentration, not expected "to harm anyone." (ROA.4445.)

Nothing in Drs. Krouse or Johnson's testimony is grounds for setting aside the jury verdict. If anything, their testimony supported the verdict. The jury, moreover, was free to credit the well-founded testimony of Drs. Fries and Hail—who directly testified that fentanyl caused Skaggs's death—because determining the weight and credibility of the evidence is the "'sole province of the jury.'" *Gaspar-Felipe*, 4 F.4th at 341 (quoting *United States v. Parker*, 505 F.3d 323, 331 (5th Cir. 2007)).

Strong circumstantial evidence, moreover, supported the verdict. Chief among that evidence were the chemicals found in Skaggs's blood; it contained oxymorphone, the body's byproduct of processing oxycodone, but no norfentanyl, the byproduct of processing fentanyl. (ROA.4257, 4463, 5048.) That "lack of norfentanyl suggests a rapid death from fentanyl." (ROA.5048.) So, too, did the position of Skaggs's body when he died. Skaggs was found face down on the bed, partially clothed with his boots still on his feet. (GX 95; ROA.5685, 5697-98.) The way that Skaggs had fallen on to the bed was consistent with someone suffering from "central nervous system depression,"

who ultimately stopped breathing and died. (ROA.5050-51.) Finally, the jury saw how Skaggs's was found laying inches from his cellphone—the same one he had used to ask Kay to come by shortly before his death. (ROA.5692; GX 95.) And the jury saw how Skaggs sent his last text messages at 12:02 a.m. and thereafter never responded to his wife's repeated messages. (ROA.1903-04, 5096-97; GX 4, 176.) All of that evidence establishes a clear timeline—at 11:50 p.m. Kay agreed to come to Skaggs's room and just 12 minutes later Skaggs stopped responding to text messages—from which a rational juror could infer that Skaggs snorted the fentanyl Kay delivered, and it resulted in Skaggs's death.

This Court affirmed a jury's but-for-causation finding in *United States v. Thompson*, 945 F.3d 340, 345 (5th Cir. 2019), on materially similar evidence. There, the doctor who treated the victim testified that but-for the victim's use of heroin, she would not have suffered serious bodily injury. *Id.* at 345. Furthermore, the circumstances of the victim's overdose—where she collapsed shortly after ingesting heroin and was revived shortly after receiving Narcan— further supported the jury's verdict. *Id.* The same is true here. The jury's finding was amply supported by the doctors' testimony and the circumstances surrounding Skaggs's death. This Court should thus affirm. *Id.*

**C.    Overwhelming evidence supported the jury's verdict on Count One.**

Kay argues that the evidence was lacking because (1) the government did not prove that he or the players he dealt to profited from their conspiracy; and (2) he is immune under this Circuit's buyer-seller exception.  He is wrong on both scores.  "Profit" is not an element of a conviction for conspiring to traffic drugs, and the evidence overwhelmingly established that Kay conspired with Diaz, Ashley Smith, Skaggs, and others to violate the narcotics laws.  The evidence was more than sufficient.

"The essential elements of a drug conspiracy are (1) an agreement by two or more persons to violate the narcotics laws; (2) a defendant's knowledge of the agreement; and (3) his voluntary participation in the agreement." *Vargas-Ocampo*, 747 F.3d at 303.  "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances."  *United States v. Rodriguez*, 831 F.3d 663, 666 (5th Cir. 2016) (internal quotation marks omitted).

This record is not "devoid" of evidence that Kay conspired to traffic drugs as the evidence proved his conspiracy with up-stream suppliers, like Diaz, Hector Vasquez, and Smith.  That evidence was overwhelming and included text messages, cell-tower records, Venmo records, and testimony.

31

Start with Kay's admission that from "2017 to 2019, Eric Kay engaged in a conspiracy to get pills to Tyler Skaggs. He did." (ROA.5322.) Next, consider Hector Vasquez and Smith. Cellphone records show that, after Kay returned from drug rehab, Vasquez connected Kay with Smith. (GX 141, 142; ROA.2884-86, 4536-37, 4541-42; *see also* ROA.3666, 3669 (Kay's admission that Vasquez connected Kay with Smith to source pills).) Kay and Smith began communicating on June 19, 2019, and exchanged batches of communications over the next two weeks. (GX 140, 161.) Vasquez and Smith communicated frequently during that timeframe, too. (GX 142.) And, as discussed, the evidence allows the reasonable inference that Smith sold Kay the counterfeit-fentanyl pills on June 30. (*See* ROA.2942-43; GX 161; *see also supra* Part 1.A.ii); *United States v. Gutierrez*, 699 F. App'x 414, 415 (5th Cir. 2017) (holding that evidence was sufficient where "[p]hone records revealed numerous contacts between Gutierrez and the other conspirators throughout the existence of the conspiracy").

Critically, moreover, Smith dropped her phone soon after Skaggs's death was announced; she then contacted Kay from a new number before cutting off communication with him, and then she contacted Vasquez from her new number. (ROA.4525-26, 4664-66; GX 47, GX 142.) If Smith thought Kay was the end-user, why would she drop her burner phone after a baseball player

supplied by Kay died in another state?  A rational juror could conclude that she, Vasquez, and Kay conspired to redistribute pills to players and, after a user died, communicated about avoiding detection.  *See Tenorio*, 360 F.3d at 495; *see also United States v. Pedroza*, 78 F.3d 179, 183 (5th Cir. 1996); *United States v. Benito*, 835 F. App'x 789, 790 (5th Cir. 2021) (explaining that a rational jury could find that appellant engaged in a conspiracy where the evidence showed, inter alia, that he "called his supplier to report that law enforcement agents had seized the proceeds of a drug sale").

Moreover, Kay's Venmo records proved he conspired with other up-stream suppliers, like Diaz.  Those records show one transaction in which Skaggs paid Kay $400 and—three minutes later—Kay transferred $400 to Diaz for "goods."  (GX 145; ROA.2900.)  And Kay paid Diaz $200 for "Skittle," $250 for "Lemons," and $160 for an emoji depicting a lemon, within the same week that Skaggs paid Kay $600 in one transaction, $500 in second, and $400 in a third.  (GX 145; ROA.2900, 4825-26.)  From that evidence, a rational juror could conclude that Kay was conspiring with one of his sources, Diaz, to get opioids for redistribution.

Moreover, the evidence also showed that Kay conspired with the people to whom he sold opioids, including Skaggs.  As this Court explained en banc in *Delgado*, a person "'becomes a member of a drug conspiracy if he *knowingly*

*participates in a plan to distribute drugs*, whether by buying, selling or otherwise.'"
*Delgado*, 672 F.3d at 333 (quoting *United States v. Maseratti*, 1 F.3d 330, 336 (5th
Cir. 1993)).  Here, trial evidence established that Kay distributed opioids to
Skaggs on numerous occasions.  That evidence included the Venmo records
discussed above; the evidence that Kay delivered the fentanyl that killed
Skaggs (also discussed above); and players who testified that Kay was Skaggs's
source for "blues," (*e.g.*, ROA.4930 (Harvey), ROA.4971 (Cron); GX 17 (Kay
attempting to sell Morin and Skaggs opioids)).

Skaggs and Kay further worked together to distribute opioids to other
players.  Skaggs connected Kay with Morin, who began buying his opioids
from Kay.  (ROA.4991-92.)  Also, Skaggs and Kay once worked together to
get drugs to Cron; Cron paid Kay, and Skaggs delivered the drugs to Cron's
hotel room.  (ROA.4973-78.)  Kay's conviction is anything but "shocking,"
*Delgado*, 672 F.3d at 331, because the evidence was overwhelming.

Kay's three counterarguments—that he never sought to profit, that he
was in a mere buyer-seller relationship, and the government failed to prove
venue—are unpersuasive.

First, Kay claims there could be no conspiracy because neither he nor
the players profited from their repeated drug deals.  (Br. at 42-43.)  But "profit"
is not an element of a drug-trafficking conspiracy under Section 846.  *See* 21

U.S.C. §§ 841, 846; *see also United States v. Shabani*, 513 U.S. 10, 17 (1994)

(holding that no overt act required to violate Section 846).[3]  Kay has cited—

and the government has found—no case requiring the government to prove as

an element that the conspirators sought to "profit."  *See United States v. Johnson*,

481 F.2d 645, 646-47 (5th Cir. 1973) (rejecting defendant's argument that he

was not guilty of distributing drugs because he was simply a conduit for the

drugs, not a seller).

Even so, Kay's Venmo records show that he profited from the

conspiracy.[4]  In late April 2018, Skaggs paid Kay $1500 across three

transactions.  (*See* ROA.2900.)  But Kay, in turn, paid Diaz only $1110.  A

rational juror could conclude that Kay conspired with Diaz to sell opioids and

turned a nearly $400 profit in one week by doing so.  As Agent Ferry testified,

middlemen (like Kay) "profit" from these conspiracies.  (ROA.4851.)

Second, Kay seeks acquittal under this Circuit's buyer-seller exception.

(Br. at 43-46.)  Kay misplaces his heavy reliance on out-of-circuit cases.  (Br. at

43-45.)  In this Circuit, the exception merely "prevents a *single* buy-sell

agreement, which is necessarily reached in every commercial drug transaction

---

[3] Kay never requested a jury instruction requiring a finding of "profit," nor does he challenge the propriety of the jury charge on appeal.

[4] Kay also received other benefits, such as cheaper prices on the pills he used to fuel his own addiction.  (*See, e.g.*, GX 17 Kay texting "[c]an get 50 at $22 per.  So 1,100.  I would jump on this.  *Has to be 50 tho*". (emphasis added).)

from automatically becoming a conspiracy to distribute drugs." *Delgado*, 672 F.3d at 333 (emphasis added). The rule shields mere "acquirers and street-level users" from the "more severe penalties reserved for distributers," like Kay. *Id.*

Kay is not immune under this Court's buyer-seller exception to conspiracy. His conspiracy with Vasquez, Smith, and Diaz to redistribute opioids to players—and his numerous sales to players like Skaggs and Cron—make Kay more than "merely an acquirer or street-level user to which the buyer-seller exception would apply." *United States v. Jones*, 969 F.3d 192, 198 (5th Cir. 2020) (internal quotation marks omitted). As Kay's counsel conceded in closing argument, from "2017 to 2019, Eric Kay engaged in a conspiracy to get pills to Tyler Skaggs." (ROA.5322.) And, as discussed above, a rational juror could infer that, on numerous occasions, Kay purchased opioids from Diaz and Smith to redistribute to players, including Skaggs.

Moreover, Kay was not merely involved in a *single* transaction with a buyer, to which the exception could apply. *See United States v. Escajeda*, 8 F.4th 423, 426 (5th Cir. 2021) ("But Escajeda made two sales to the government informant, so this exception cannot cover him."); *United States v. Wiseman*, 576 F. App'x 376, 378-79 (5th Cir. 2014) (unpublished) ("the buyer-seller exception generally applies to 'a single buy-sell agreement.'") (quoting *Delgado*, 672 F.3d

at 331).  Kay bought and resold from Diaz and Smith and made numerous sales to Skaggs and Cron.  Cron testified that while Kay typically sold him "five or six pills" at a time, he bought "a little bit more" on a couple of occasions.  (*See* ROA.4979-80.)  And Skaggs and Kay worked together to distribute pills to Cron, with Kay taking the money and Skaggs delivering the pills.  (ROA.4973-74.)  Kay's reliance on the buyer-seller exception is misplaced, and this Court should affirm.

Third, Kay repeats his arguments about venue.  (Br. at 46-49.)  The jury found venue proper, (ROA.949-50, 954), and that finding is well supported by record evidence.  In conspiracy cases, "venue is proper in any district where the agreement was formed or where an overt act occurred." *United States v. Thomas*, 690 F.3d 358, 369 (5th Cir. 2012) (internal quotation marks omitted).  "Venue can be based on evidence of any single act that initiated, perpetuated, or completed the crime, and circumstantial evidence suffices to establish venue." *Id.* (internal quotation marks omitted).  Here, the evidence proved that Kay *distributed* fentanyl to Skaggs in the Northern District of Texas. (*Supra* Part 1.A.iii-iv.)  That evidence alone requires affirmance.  *See United States v. Solis*, 299 F.3d 420, 444-45 (5th Cir. 2002).

So, too, does the evidence of Kay's overt acts to avoid detection. Where, as here, "a conspiracy to possess with intent to distribute drugs

contemplates a continuity of purpose and continued performance of acts, the conspiracy is presumed to exist until there has been an affirmative showing that it has terminated." *United States v. Romans*, 823 F.3d 299, 310 (5th Cir. 2016) (cleaned up). "Given that concealment is often a necessary part of a conspiracy, statements made to aid the concealment are made in furtherance of the conspiracy." *United States v. Broussard*, 80 F.3d 1025, 1039 (5th Cir. 1997). In Texas, Kay lied to police, told Harvey they needed stick together, and communicated with Smith on her new phone. A rational juror could conclude that Kay took these actions "to facilitate the conspiracy's continued operation by keeping it concealed," meaning venue is proper here. *United States v. Curtis*, 635 F.3d 704, 717 (5th Cir. 2011). Kay argues that his conspiracy ended the second Skaggs died. (Br. 47-48.) But the indictment charged a conspiracy through July 2019, (ROA.563), and the jury saw how Kay was still trying to source opioids days *after* Skaggs's death, (GX 138; ROA.2821). A rational jury could have concluded that Kay was attempting to cover up the existence of an ongoing conspiracy. This Court should affirm.

**2.    Kay has failed to show error—let alone reversible error—in the prosecutors' closing arguments.**

**Standard of Review**

Kay objected to two of the six challenged comments, preserving his challenge to those statements only.[5] "Where a defendant ha[s] objected to allegedly improper statements made by a prosecutor, and the district court admitted the challenged statements over the defendant's objection, [this Court] review[s] the admission of those statements for abuse of discretion." *United States v. Alaniz*, 726 F.3d 586, 615 (5th Cir. 2013). The Court "must first decide whether the prosecutor made an improper remark" and, only if so, whether it impacted the defendant's substantial rights. *Id.* (internal quotation marks and citation omitted). Even where a challenge is preserved, a defendant's burden is onerous. *See United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001). This Court will "not lightly make" the decision to overturn a conviction because of improper closing arguments. *Id.*; *accord United States v. Bennett*, 874 F.3d 236, 247 (5th Cir. 2017).

Most of Kay's allegations of improper argument are reviewed for plain error. *See United States v. Aguilar*, 645 F.3d 319, 323 (5th Cir. 2011). That

---

[5] Kay objected when the prosecutor (1) likened his counsel's closing arguments to an octopus squirting ink to avoid a predator, (ROA.5341); and (2) argued that no evidence showed Garet Ramos deleted a text message from Skaggs's phone, (ROA.5342).

standard only heightens his onerous burden. *If* a defendant shows clear or obvious error in the district court's failure to intervene sua sponte, then this Court considers whether the improper remark affected the defendant's substantial rights. "[T]he determinative question is whether the prosecutor's remarks cast *serious doubt on the correctness of the jury's verdict*." *Aguilar*, 645 F.3d at 325 (internal quotation marks and citations omitted) (emphasis added). This is a "high bar" to clear. *Id.* This Court "consider[s] (a) the magnitude of the prejudicial effect of the statements; (b) the efficacy of any cautionary instructions; and (c) the strength of the evidence of defendant's guilt." *Id.*

**Discussion**

Kay argues that the government misstated the evidence, improperly vouched for its witnesses, and personally attacked his counsel. The record proves otherwise. As detailed below, the government based its arguments on reasonable inferences from properly admitted evidence—as this Court's caselaw permits. The record shows that the prosecutor was not "vouching" for any witness. Nor can Kay show plain error where he too called a player to testify about buying drugs from Kay—and repeatedly conceded that he had sold drugs to players. Finally, the government attacked counsel's closing *arguments*, not his counsel personally. Kay's arguments are meritless.

40

### A.    Prosecutors did not misstate the trial evidence.

The purpose of closing argument "is to assist the jury in analyzing, evaluating, and applying the evidence," and a prosecutor may "discuss[] properly admitted evidence and any reasonable inferences of conclusions that can be drawn from that evidence." *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) (internal quotation marks omitted). She may also "directly respond to theories of the evidence offered by defense counsel." *United States v. Lara*, 23 F.4th 459, 481 (5th Cir. 2022). On appeal, this Court "examine[s] a prosecutor's allegedly improper remarks 'in context' rather than 'isolation.'" *Id.*

> ### i.    The evidence supported a prosecutor's argument that Garet Ramos did not delete text messages from Skaggs's phone after Skaggs's death.

Kay claims that the prosecutor misstated the evidence when she argued that there was "no evidence" of deleted text messages between Skaggs and Leanos. (Br. at 52-54.) But Kay's argument strips away context. In context, the prosecutor was arguing that no evidence showed that *Garet Ramos* deleted text messages from *Skaggs's phone* after his death. She did not misstate the evidence.

In "determining whether a prosecutor's comment was improper, it is necessary to look at the comment in context." *United States v. McCann*, 613

F.3d 486, 495 (5th Cir. 2010) (internal quotation marks and citation omitted).

Here, the prosecutor was rebutting Kay's argument that, after Skaggs's death,

"Garet Ramos deleted" a text message between Leanos and Skaggs.

(ROA.5318.)  Kay argued that his Ramos-deleted-it theory was a "reasonable

inference" from the record, and the prosecutor correctly responded that "no

evidence" supported that theory.  (ROA.5342.)

She then walked the jury through the evidence that disproved it, pointing

to the testimony of Sergeant Macheca.  (ROA.5343.)  Macheca's testimony

was clear:

> [Prosecutor]: Where were you when Garet had the phone?
>
> [Sergeant Macheca]. I made every attempt to stay behind him as much as I could.
>
> [Prosecutor]. So, could you see the phone at all times?
>
> [Macheca]. Most of the time, yes.
>
> [Prosecutor]. And was he able to alter or delete items from the phone?
>
> [Sergeant Macheca]. No.
>
> [Prosecutor]. Do you know what it looks like to delete a text message from an iPhone?
>
> [Sergeant Macheca]. I do.
>
> [Prosecutor]. And did Garet Ramos do that while you were standing there?

[Sergeant Macheca].  He did not.

(ROA.4778-79.)

The prosecutor also pointed to the testimony of Stefan Hare, a Secret Service network intrusion forensic analyst.  (ROA.5343.)  Hare examined Skaggs's phone looking for deleted text messages from Leanos during the relevant timeframe and found none.  (ROA.4142-46, 4180.)  The prosecutor also pointed to Ramos's testimony.  (ROA.5343.)  He testified that he "was asked to change the password *and then gave [the phone] right back*."  (ROA.5200 (emphasis added).)  The prosecutor was accurate in arguing that the Ramos-deleted-it-theory had no support in this record.  *See Lara*, 23 F.4th at 482.

Kay claims otherwise because Leanos admitted deleting a text exchange from his own phone with Skaggs.  (Br. at 54; *see also* ROA.4730-31.)  Kay argues from that admission by Leanos that *Ramos* must have deleted the messages from *Skaggs*'s phone.  But that logical leap is simply too much to say there is "evidence" that Ramos did so.  Moreover, the prosecutor expressly acknowledged that Leanos had "admitted to receiving text messages from Tyler Skaggs about a pill, and then he admitted to having deleted them."  (ROA.5309.)  This record belies Kay's claim that the government's argument misstated the evidence.

43

> ii.   **The evidence supported the prosecutor's argument that Kay was Skaggs's only source for blue, 30-miligram oxycodone pills.**

Kay complains that the prosecutor said he was Skaggs's only source for drugs. (Br. at 55 (citing ROA.5306).) But, when read in context, the prosecutor's argument was that Kay was the only source for *blue, 30-miligram oxycodone pills*—like the fentanyl-counterfeit pill that killed Skaggs.

Indeed, while discussing the defense theory that Skaggs had another source, the prosecutor expressly acknowledged Harvey's testimony that he gave Skaggs pink "oxycodone pills." (ROA.5308.) Her acknowledgment defeats Kay's argument that she was trying to mislead the jury about potential sources. (*See* Br. at 55.) Additional context makes clear that she was arguing about the fatal blue pill:

> [Matt Harvey] admitted, I gave Tyler Skaggs five pink pills, but we know those pink pills, they didn't contain fentanyl. KVK Tech made them. They were legitimate, pharmaceutical oxycodone pills, and *we know that he gave them to Tyler. He said that he did . . . . Mr. Harvey did give Tyler Skaggs pills, but he didn't give him a counterfeit blue 30-milligram oxycodone pill made of fentanyl.*

(ROA.5308) (emphasis added).

The prosecutor also addressed Kay's allegation, repeated here, that Leanos was the source of the fatal fentanyl. (Br. at 55.) Again, her argument embraced Leanos's admission that he was a "drug dealer." (ROA.5308.) But she explained that Leanos did not deal oxycodone and was not the source of

44

the fatal pill. (ROA.5308-10.) Her argument that Kay was the "only source"—when placed in proper context—did not mislead the jury about the testimony of Harvey, Leanos, or any other witness. Thus, Kay fails to establish any error, let alone clear, obvious, or prejudicial error.

### iii. The prosecutor accurately characterized the doctors' testimony about the cause of Skaggs's death.

There is no merit to Kay's claim that the prosecutor misrepresented four doctors' testimony concerning the but-for cause of Skaggs's death. (Br. at 56-57.) The prosecutor stated:

> But-for. I guess [the defense] ha[s] to argue that even though every witness said the same thing, every witness said it was the fentanyl, that even their agreement is somehow a disagreement? I mean, what do you say when all of the medical professionals say it was the fentanyl?

> Dr. Hail says, but-for the fentanyl, [Skaggs] would be alive. Dr. Fries, but-for the fentanyl, [Skaggs] would be alive. Dr. Johnson, the oxy [in Skaggs's system] was therapeutic and had already begun metabolizing. Fentanyl, lethal levels. Dr. Krouse, it's the third thing. The other two [alcohol and oxycodone] were in the in the system, and [Skaggs] died shortly after the fentanyl. That's what [Dr. Krouse] told you.

(ROA.5350.) The prosecutor's argument was a proper rebuttal of Kay's attempt to place a wedge between the conclusions drawn by Drs. Krouse and Hail, (ROA.5321-22), and entirely consistent with the record evidence:

| Prosecutor's Argument | Witness's Testimony |
|---|---|
| "Dr. Hail says, but-for the fentanyl, [Skaggs] would be alive." <br><br> (ROA.5350.) | **Dr. Hail.** <br> Q. Dr. Hail, if you take the alcohol out of Tyler Skaggs's system that night, does he die? <br><br> A. If you take the alcohol out, yes. <br><br> Q. If you take the oxycodone out of his system that night, does he die? <br><br> A. Yes. <br><br> Q. If you take the fentanyl out of his system that night, in your opinion, does he die? <br><br> A. No. <br><br> (ROA.5052.) |
| "Dr. Johnson, the oxy [in Skaggs's system] was therapeutic and had already begun metabolizing. Fentanyl, lethal levels." <br><br> (ROA.5350.) | **Dr. Johnson.** <br> Q. And then I'm going to skip oxymorphone and go to oxycodone.  What was the amount of oxycodone? <br><br> A. 38 nanograms per milliliter. . . . <br><br> Q. And so, you would consider 38 therapeutic? <br><br> A. It would be, yes. <br><br> Q. Okay.  Then how about the fentanyl? <br><br> A. 3.8 nanograms per milliliter. |

Q. And is there a minimum lethal, from reference, that -- generally, that you consider?

A. Yes, ma'am. The same reference book, the minimum lethal concentration published in that manual is 3 nanograms per milliliter.

(ROA.4439-4440.)

\*\*\*

Q. And based on your testimony about the amounts, was there, in your mind, one of those drugs that caused the death of Tyler Skaggs?

A. Well, from the tox perspective, one of those is much more significant, and it would be the fentanyl. Like we talked about already, the oxycodone that was found is at a relatively low concentration, and I, as a toxicologist, wouldn't expect it to harm anyone.

Q. But the fentanyl, how about that?

A. It is at a concentration that does cause concern, yes.

**(ROA.4445.)**

\*\*\*

Q. Okay. I think you talked some about metabolizing the oxycodone.

| | Do you believe it was metabolized in Mr. Skaggs's body?<br><br>A. Yes.  The presence of oxymorphone is normal following the consumption of oxycodone because that's the major metabolite of that drug.<br><br>(ROA.4463.) |
|---|---|
| "Dr. Fries, but-for the fentanyl, [Skaggs] would be alive."<br><br>(ROA.5350.) | **Dr. Fries.**<br><br>Q. Dr. Fries, what was the but-for cause of death of Mr. Skaggs?<br><br>A. In this case, I would consider it the fentanyl.  The oxycodone is at a therapeutic level.  The ethanol is .1, which we commonly see people, you know, walking around with that level of alcohol.  So, those alone, I wouldn't expect to have caused the death in this case.<br><br>(ROA.4341.) |
| "Dr. Krouse, it's the third thing.  The other two [alcohol and oxycodone] were in the in the system, and [Skaggs] died shortly after the fentanyl.  That's what [Dr. Krouse] told you."<br><br>(ROA.5350.) | **Dr. Krouse.**  "I do, yes.  Thank you for the clarification.  Yeah, those concentration numbers are almost identical.  Oxycodone, we're finding oxymorphone, which takes a little while to show up.  *Fentanyl, we're not finding norfentanyl, which takes just minutes to show up*, according to the consultations I've had with Dr. Johnson, and reading. |

|  | So, if you have one thing, and then you add something to it, *you add a third thing and then the person dies, the inference is that that third thing is of great significance.*" |
|  | (ROA.4250-51.) |

The prosecutor accurately restated the doctors' testimony—indeed, nearly verbatim—and argued the natural inference therefrom that, but-for ingesting fentanyl, Skaggs would have survived.  On this record, Kay cannot show that she misled the jury, let alone committed reversible plain error.

### iv.    The prosecutor's argument that Kay was in the room when Skaggs died was a fair inference from the record evidence.

Finally, Kay complains because the prosecutor rebutted his argument that the government was striving for a conviction by "turn[ing] Eric Kay into a monster," (ROA.5335).  (Br. at 57-60.)  Specifically, counsel argued that the government was trying to portray Kay, a "good guy" without "a mean bone in his body," as a "monster who sat there and watched [Skaggs] in distress." (ROA.5335.)  In rebuttal, the prosecutor explained that whether Kay was present when Skaggs overdosed was not the controlling question. (ROA.5351.)  As the prosecutor said, "we don't have to prove Eric Kay was in there when [Skaggs] died, but we did."  (ROA.5351.)

The prosecutor explained the record evidence leading to that logical conclusion. (ROA.5351.) In addition to the evidence she highlighted, that conclusion flows from the following trial evidence: (1) the hotel's electronic records show that Kay opened his room (367) with his keycard at 11:39 p.m., (ROA.4620); (2) thereafter, Skaggs texted Kay to "come by" room 469, (GX 15); (3) Kay responded in the affirmative at 11:50 p.m., (GX 15); (4) Skaggs suffered a "rapid death" shortly after ingesting fentanyl, (ROA.5048); (5) by 12:02 a.m., Skaggs was no longer responding to text messages from his wife, which was "very odd" for him, (ROA.5096-97); (6) Skaggs died wearing his jeans and boots from the day before, (GX 95); (7) Kay did not access his room again via key card until 8 hours later—8:25 a.m. on July 1, (GX 127; ROA.4619-20); (8) before Kay did so, he obtained a new key card from the front desk, (ROA.4619-20); (9) later that day, Kay lied to the police about Skaggs's drug usage and being in Skaggs's room, (ROA.4774); and (10) Kay told Chodzko that he *was* in Skaggs's room and "watched [him] do the three lines," (ROA. 4672-73). That evidence led to the natural, logical conclusion that Kay went to Skaggs's room, delivered the pill that caused his rapid death, was there when Skaggs died, and did not return to his room until the next morning.

Kay claims that the prosecutor's argument was "clearly and obviously" error because Kay "may have propped the door open when he left for Skaggs's room" and returned to his own room before Skaggs died.  (Br. at 56, 58.)  But Kay's argument is nothing more than an alternative inference he wants to be drawn from the evidence.  Because the prosecutor's inference was amply supported by the record, Kay cannot show that she committed clear or obvious error in arguing that he was present when Skaggs died.  *See Lara*, 23 F.4th at 482; *United States v. Munoz*, 150 F.3d 401, 414-15 (5th Cir. 1998) (observing that a prosecutor may recite to the jury "those inferences and conclusions [s]he wishes [the jury] to draw from the evidence so long as those inferences are grounded upon evidence").

### B.    The government did not vouch for its witnesses.

The record disproves Kay's claim that the prosecutor committed plain error by "vouching" for the players.  (Br. at 61.)  Rather, she was rebutting Kay's arguments that Skaggs alone was responsible for his own death.  (*See* ROA.5345; *see also, e.g.*, ROA.5319, 5324 (arguing that Skaggs's death was his own fault because he was a "grown man, who is living a life of complete luxury, of privilege, he doesn't carry his own luggage," but he "has demons").)  It was in that context that she said, "you watched these [players] march in here, and they didn't want to do it, but they stood up and they told the truth."

(ROA.5345.)  Her point was that the players had admitted to using illegal drugs, not that the jury should believe their testimony was "the truth" because she said so.  This reading of the record is buttressed by the fact that Kay admitted he sold drugs to players and no one disputed their credibility; thus, the prosecutor would have no reason—and made no attempt—to bolster their credibility.  Her remark, read in context, was proper.

Moreover, Kay's argument ignores two more key features of this case, which separate it from a typical impermissible-vouching case.  *See, e.g.*, *United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008).  *First*, both sides—the government and *the defense*—called players to testify that Kay sold them drugs.  Kay called Blake Parker and elicited his testimony about buying drugs from Kay.  (ROA.5243-44.)  *Second*, Kay conceded before the jury (and does so again on appeal, (*e.g.*, Br. at 12)), that he sold opioids to Angels players.  (*See* ROA.3666-67 (in Kay's opening statement, "Tyler starts introducing other players into their relationship. . . .  But Eric's not making profit off this.  At most, [Kay's] getting some drugs, some of his drugs for free."); ROA.5326 (Kay's closing argument that he put a pill in Matt Harvey's locker, "which is [Kay's] *pattern*, as shown by the evidence." (emphasis added).)

Where the prosecutor was (1) not vouching, and (2) talking about players, called by both sides, who testified to their own illegal behavior that

Kay conceded had occurred, he cannot show error.  Nor can he show *clear* and *obvious* error, as is his burden at plain error's second prong.  This Court has held that "lack of Fifth Circuit controlling authority on [an] issue mean[s] that there was not plain error." *United States v. Rodriguez-Parra*, 581 F.3d 227, 231 (5th Cir. 2009).

Kay cites no case establishing clear or obvious error under these—or even similar—circumstances.  Rather, he quotes extensively from *Gracia*, (Br. at 62), which is inapposite.  There, in response to defense statements implying that key law-enforcement witnesses were not "altogether truthful," the prosecutor: (1) argued the "agents were 'very, very credible' witnesses"; (2) "asked the jurors rhetorically whether they thought that an agent 'who has worked as a law enforcement agent for many years, that is his career, that is his chosen life, a man from this area, a man with a family, do you think that he would throw all that away by taking this stand and taking an oath and lying to you to get Mr. Gracia'"; (3) "told the jury: 'I'm going to ask you to respect their efforts as law enforcement officials and to believe the testimony that they offered'"; and (4) admonished the jurors that acquittal would require believing "the agents 'got out of bed' on the day they arrested Gracia and decided that this was 'the day that [they] were going to start [a] conspiracy to wrongfully convict Mr. Gracia.'"  *Gracia*, 522 F.3d at 600.  Here, by contrast, the

prosecutor's statement that the players were telling the truth meant that they had fessed up to wrongdoing and extended to Kay's witness as well.

While this Court has understandably prohibited a prosecutor from vouching for the government's witnesses on disputed factual issues, the rationale behind the rule establishes why it is an ill fit here. Such vouching implicitly relies on "something uniquely within the prosecutor's knowledge"— something beyond the witness's testimony alone. *Gracia*, 522 F.3d at 601. No such inference can be drawn for the opposing party's witness. For these reasons, Kay has failed to show clear and obvious error.

Even if this Court were to conclude otherwise, this discussion makes clear why Kay cannot show any impact on his substantial rights. First, the prosecutor was not vouching. Second, her use of the word "truth" was a single, isolated statement. *Cf. Gracia*, 522 F.3d at 601 (reversing where "the four at-issue statements were neither isolated nor limited, but were cumulative components of a single diatribe, indisputably geared toward bolstering the agents' testimony"). Third, Kay conceded below (as he does here) that he sold drugs to the players. (*See* Br. at 12.) Given (1) Kay's repeated concessions; (2) that a defense witness testified to these facts; and (3) Kay's own text messages proved that he was selling drugs to players, (*e.g.*, GX 19), he cannot show that the prosecutor's isolated remark prejudiced him beyond what his

concessions and the evidence did.  Kay has failed to show error, let alone

reversible plain error.

## C.    The government made no personal attack on counsel.

Kay alleges that the prosecutor impermissibly attacked his counsel.  (Br.

at 62-63.)  The prosecutor—whose argument was clearly attacking Kay's

*arguments* for acquittal, not his counsel—stated:

> When we were young, we all learned about an octopus, right?
> And when an octopus is trying to escape, it squirts all of this ink.
> And the person coming after it, or the being coming after it, it
> squirts this ink to confuse it, so it doesn't know which way the
> octopus is trying to get away, and that's what the defense tried to
> do in this case.

(ROA.5341.)  The prosecutor then discussed "some of that ink," starting with

the contention that Garet Ramos deleted text messages from Skaggs's phone,

(ROA.5342), and then addressing other arguments, (*see* ROA.5345 ("It's

Tyler's fault.  *That's the next argument*.") (emphasis added)).  Her argument was

proper.

A prosecutor may not "impugn the integrity of a particular lawyer or

that of lawyers in general, without basis in fact, as a means of imputing guilt to

a defendant."  *United States v. Valas*, 822 F.3d 228, 245 (5th Cir. 2016)

(emphasis added) (quoting *United States v. McDonald*, 620 F.2d 559, 564 (5th

Cir. 1980)).  But the rule against attacking the integrity of defense *attorneys*

does not extend to argument "attacking the strength of the defense *on the*

merits." *See United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002) (emphasis added).

In *Bernard*, this Court found no error in a variety of statements attacking the substance of the defense's arguments. *Id.* There, the prosecutor argued that the evidence of the defendants' guilt was so overwhelming that defense counsel, in closing argument, had no choice but to "try to create a doubt where one did not exist." *Id.* The prosecutor described defense counsel's closing argument as

> trying to convince you any way they can, any possibility, no matter how remote or extreme it would be, to *try to get someone on this jury to follow down a rabbit trail* and *take a red herring* and somehow say, "Oh, I've got a doubt." Not based on facts, but based purely on conjecture and speculation. Ladies and gentlemen, *if these guys had another hour, they'd be trying to convince you it's midnight outside right now.*

*Id.* (emphasis added). "The prosecutor continued to argue that defense counsel *made up an 'outrageous theory' out of desperation* in an attempt to *mislead the jurors.*" *Id.* (emphasis added). This Court held that these statements were allowable as challenges to the defense's substantive arguments. *Id.*

Similarly, in *United States v. Neal Uy Lim*, this Court declined to find error in a prosecutor's argument that a defense argument was a "smoke screen." 500 F. App'x 323, 326 (5th Cir. 2012). Relying on *Bernard*, the Court held that

this comment did "not appear to be an attack on defense counsel but instead . .

. directed at defense counsel's *argument*." *Id.* (emphasis added).

These cases demonstrate that the prosecutor did not err. Her analogy to

an octopus dispersing ink was not a personal attack on defense counsel; it was

a characterization of specific defense *arguments*, like those affirmed by this

Court in *Bernard* and *Uy Lim*.

### D. Even if the Court finds error in one or more of the statements, it should affirm.

Should this Court find impropriety within this hodgepodge of challenges,

it should still affirm. "This court has held that for the improper comment or

questioning to represent reversible error, it generally must be so pronounced

and persistent that it permeates the entire atmosphere of the trial." *Greenlaw*,

2023 WL 4856259, at *21 (cleaned up). A prosecutor's improper closing

arguments constitute reversible error only when they "cast serious doubt on the

correctness of the jury's verdict." *Id.* (internal quotation marks omitted).

Here, none of the challenged statements cast "serious doubt on the

correctness of the jury's verdict" for several reasons. *See Aguilar*, 645 F.3d at

325. *First*, the court's instructions to the jury were clear: attorney argument is

not evidence. (*See, e.g.*, ROA.5280.) *Second*, as discussed throughout, the

evidence to support the jury's verdict was strong. Thus, there is no risk that

the jury convicted Kay because of prosecutorial statements.

These same arguments demonstrate why, should the Court determine that the first three prongs of plain error are met as to Kay's unpreserved objections, it should not exercise its discretion to intervene on the fourth prong of plain-error review.  This Court has recognized "the importance of this fourth prong of plain error review as an independent criterion that helps guard against any potential floodgates of plain error corrections." *United States v. Andaverde-Tinoco*, 741 F.3d 509, 523 (5th Cir. 2013).  "Importantly, the burden is on the defendant to demonstrate that the error affects the fairness, integrity, or public reputation of judicial proceedings." *Andaverde-Tinoco*, 741 F.3d at 523. Kay has not done so, thus the Court should decline to exercise its fourth-prong discretion.

In sum, Kay has not shown that any of the challenged statements—which were proper in any event—likely affected the outcome of the trial. He has not carried the "substantial burden" required to warrant reversal. *See Bennett*, 874 F.3d at 247.

### E.     There was no error, let alone reversible "cumulative error."

Rather than attempt to shoulder his "substantial burden"—discussed above and required under this Court's caselaw to gain a new trial for improper closing arguments—Kay tries to move the goal posts by claiming that all six statements were improper in some respect and had the "synergistic effect" of

denying him a fair trial.  (Br. at 66.)  Kay misplaces reliance on the cumulative-error doctrine.

Kay's argument faces several insurmountable obstacles.  Kay has identified no errors, and such "non-errors have no weight in a cumulative error analysis."  *United States v. Stanford*, 823 F.3d 814, 843 (5th Cir. 2016) (internal quotation marks omitted).  As a result, "there is nothing to accumulate."  *Id.* (internal quotation marks omitted); *see also Greenlaw*, 2023 WL 4856259, at *23.

Even more, a multitude of non-reversible errors (i.e., plain and harmless errors that do not individually warrant reversal) are insufficient to invoke the cumulative-error doctrine.  Instead, Kay must demonstrate that the errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness."  *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007).  As this Court explained en banc in *Delgado*, "'the possibility of cumulative error is often acknowledged but practically never found persuasive.'"  672 F.3d at 344 (quoting *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc)).  "Its application is especially uncommon where, as here, the government presents substantial evidence of guilt."  *Id.*  Kay's is not "the unusual case in which synergistic or repetitive error" rendered his trial fundamentally unfair.  *Id.*

This Court should reject his attempt to resort to the cumulative-error doctrine and affirm.

## CONCLUSION

This Court should affirm the judgment.

Respectfully submitted,

Leigha Simonton
Unite States Attorney

*s/ Jonathan Bradshaw*
Jonathan Bradshaw
Assistant United States Attorney
Colorado Bar No. 43838
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
jonathan.bradshaw@usdoj.gov

Attorneys for Appellee

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,902 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*s/ Jonathan Bradshaw*
Jonathan Bradshaw