# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

Case No. 22-11011

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*

v.

ERIC PRESCOTT KAY
*Defendant-Appellant*

## APPELLANT'S REPLY BRIEF

Appeal from the United States District Court for
the Northern District of Texas, Fort Worth Division

BRETT ORDIWAY
Texas Bar No. 24079086
brett@udashenanton.com

MADISON MCWITHEY
Texas Bar No. 24119481
madison@udashenanton.com

UDASHEN|ANTON
8150 N. Central Expressway
Suite M1101
Dallas, Texas 75206
214-468-8100
214-468-8104 (fax)

## TABLE OF CONTENTS

Table of Authorities ................................................................ 4

Reply ................................................................................... 6

1.  The evidence is legally insufficient to support the jury's verdicts ............... 8

    a.  Standards of Review ................................................. 8

    b.  The evidence is legally insufficient to support Kay's conviction for distributing a controlled substance resulting in death. ................... 9

        i.  A rational jury could not conclude that Kay distributed fentanyl to Skaggs. .................................................................. 9

        ii.  If nothing else, a rational jury could not conclude that Kay gave Skaggs anything in Texas. ..................................................... 14

        iii.  A rational jury could not conclude that fentanyl killed Skaggs. .......... 16

    c.  The evidence is legally insufficient to support Kay's conspiracy conviction .................................................................. 19

        i.  The record is devoid of evidence that Kay conspired with anyone to distribute drugs. ......................................................... 19

        ii.  The Government failed to prove that any conspiracy was still ongoing when Kay tried to avoid suspicion. ...................................... 24

2.  The Government's closing arguments were repeatedly improper, warranting reversal under the cumulative-error doctrine ................................ 25

    a.  The Government falsely claimed that there was no evidence of deleted text messages between Skaggs and a drug-dealer friend. ............... 25

    b.  The Government falsely claimed that the evidence showed that Kay was Skaggs's only source for drugs. ....................................... 27

c.      The Government falsely claimed that "every witness said it was the fentanyl" that was the but-for cause of Skaggs's death. ................................. 28

d.      The Government falsely claimed that the evidence showed that Kay was in Skaggs's room when he died. ................................................................... 29

e.      The Government vouched for its witnesses' credibility ........................ 31

f.      The Government compared Kay's counsel to an octopus. ................... 32

g.      The Government's improper arguments denied Kay his constitutional right to a fair trial .......................................................................................... 33

Conclusion ................................................................................................. 34

Certificate of Service .................................................................................. 36

Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements .......................................................................... 36

## Table of Authorities

**Cases**

*Burrage v. United States*, 571 U.S. 204 (2014) ........................................................ 18

*Grunewald v. United States*, 353 U.S. 391 (1957) ................................................... 25

*Key v. Rapelje*, 634 F. App'x 141 (6th Cir. 2015) ................................................... 33

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010) ...................................... 33

*Smith v. United States*, 143 S. Ct. 1594 (2023) ............................................. 7, 15, 34

*United States v. Ausbie*, No. 21-50189, 2022 WL 831807 (5th Cir. May 21, 2022) . 23

*United States v. Bellew*, 369 F.3d 450 (5th Cir. 2004) ......................................... 7, 34

*United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) .......................................... 32

*United States v. Burrage*, 747 F.3d 995 (8th Cir. 2014) .................................. 8, 19, 34

*United States v. Castro-Trevino*, 464 F.3d 536 (5th Cir. 2006) ...................... 8, 19, 34

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) .................................... 23, 34

*United States v. Escajeda*, 8 F.4th 423 (5th Cir. 2021) ........................................... 23

*United States v. Ezenwere*, 748 F. App'x 603 (5th Cir. 2018) (per curiam) ............. 15

*United States v. Fitzharris*, 633 F.2d 416 (5th Cir. 1980) ......................................... 7

*United States v. Freeman*, 56 F.4th 1024 (5th Cir. 2023) ................................... 12, 13

*United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018) ................................................ 7

*United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008) ............................................ 31

*United States v. Herman*, 997 F.3d 251 (5th Cir. 2021) ............................ 7, 26, 33, 34

*United States v. Holloway*, 377 F. App'x 383 (5th Cir. 2010) (per curiam) .............. 24

*United States v. Holmes*, 406 F.3d 337 (5th Cir. 2005) ............................................ 26

*United States v. Moreno-Gonzalez*, 662 F.3d 369 (5th Cir. 2011) ........................ 6, 14

*United States v. Morris*, 46 F.3d 410 (5th Cir. 1995) .................................... 20, 22, 25

*United States v. Munoz*, 150 F.3d 401 (5th Cir. 1998) ............................................. 26

*United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977) ............................................. 13

*United States v. Neal Uy Lim*, 500 F. App'x 323 (5th Cir. 2012) ............................ 32

*United States v. Niamatali*, 712 F. App'x 417 (5th Cir. 2018) ..................... 20, 22, 25

*United States v. Owens*, 724 F. App'x 289 (5th Cir. 2018) ................................. 20, 22

*United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996) ........................................ 7

*United States v. Posada–Rios*, 158 F.3d 832 (5th Cir. 1998) .................................... 24

*United States v. Ramos-Delgado*, 763 F.3d 398 (5th Cir. 2014) .............................. 19

*United States v. Rodriguez-Lopez*, 756 F.3d 422 (5th Cir. 2014) ............................. 33

*United States v. Romans*, 823 F.3d 299 (5th Cir. 2015) ......................... 20, 22, 24, 25

*United States v. Ross*, 58 F.3d 154 (5th Cir. 1995) ................................................ 25

*United States v. Stanford*, 823 F.3d 814 (5th Cir. 2016) ......................................... 33

*United States v. Stephens*, 571 F.3d 401 (5th Cir. 2009) ........................................ 34

*United States v. Tenorio*, 360 F.3d 491 (5th Cir. 2004) .......................................... 12

*United States v. Thompson*, 945 F.3d 340 (5th Cir. 2019) ....................................7, 19

## Statutes

21 U.S.C. § 841 ........................................................................................................ 6

21 U.S.C. § 846 ..................................................................................................... 6, 20

# Reply

It's one thing to prove that Eric Kay distributed controlled substances to Major League Baseball players. It's another to prove that, in the Northern District of Texas, he conspired to do so. *See* 21 U.S.C. § 846. And it's another to prove that, in the Northern District of Texas, he distributed fentanyl to pitcher Tyler Skaggs, causing his death. *See* 21 U.S.C. § 841(a)(1) and (b)(1)(C).

With help from closing arguments in which it misstated the evidence, vouched for its witnesses' credibility, and compared Kay's attorney to an octopus, the Government persuaded the jury to disregard the gaps. Now, the Government urges this Court that its hands are tied. Never mind that under even the Government's theory of the case, Kay acquired fentanyl in California and distributed to another pitcher there—the Government says that "the evidence need not 'exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.'" Gov. Br. at 25 (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)). And forget that even the Government's expert could not "conclusively" say what killed Skaggs (ROA.5054), who had alcohol, oxycodone, and fentanyl in his system—the Government says this case is like one in which a drug dealer challenged the but-for

standard itself and argued that a middleman absolved him of responsibility. Gov. Br. at 30 (citing *United States v. Thompson*, 945 F.3d 340, 345 (5th Cir. 2019)).

No doubt, this Court's review of the sufficiency of the evidence is highly deferential to the jury's verdicts. *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018). But "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *Id.* (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996)). And "[a]lthough the jury may make factually based inferences, 'a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law.'" *Id.* (quoting *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980)). Here, the Government proved only that Kay distributed controlled substances to Major League Baseball players. Because a rational jury could merely speculate that he conspired and distributed fentanyl to Skaggs, this Court should enter a judgment of acquittal. *See, e.g., United States v. Bellew*, 369 F.3d 450, 456–57 (5th Cir. 2004). Failing that, because the Government failed to prove that Kay committed the offenses in the Northern District of Texas and its closing arguments were repeatedly improper, this Court should reverse the district court's judgment and remand this case for a new trial. *See Smith v. United States*, 143 S. Ct. 1594, 1600 (2023); *United States v. Herman*, 997 F.3d 251, 275 (5th Cir. 2021). If nothing else, because the

Government failed to prove that fentanyl was the but-for cause of Skaggs's death, this Court should modify the judgment to reflect a conviction for a lesser-included offense and remand for resentencing. *See United States v. Castro-Trevino*, 464 F.3d 536, 543 (5th Cir. 2006); *United States v. Burrage*, 747 F.3d 995, 998 (8th Cir. 2014).

### 1.  The evidence is legally insufficient to support the jury's verdicts.

#### a.  Standards of Review

In Kay's first ground in his opening brief, he attacked the sufficiency of the evidence supporting both counts. Br. at 30-51. Like at trial, Kay attacked the evidence supporting the offenses' venue elements and the distribution count's conduct elements. Br. at 32-41, 46-49. Kay further argued that under plain-error review, the evidence is insufficient to support the conspiracy count's conduct elements. Br. at 41-46.

In its brief in response, the Government disputes that Kay preserved his conduct-elements argument on the distribution count. Gov. Br. at 12. On appeal, Kay argues that the Government failed to prove (1) that he had anything to give, (2) that he gave anything to Skaggs, and (3) that fentanyl was the but-for cause of Skaggs's death. At trial, the Government contends, Kay lodged only the latter claim. Gov. Br. at 12.

The Government is correct that Kay's oral motion for a judgment of acquittal was specific. ROA.5276-77. But in his written motion for a judgment of acquittal, Kay argued generally: "[T]here was no evidence from which any rational juror could conclude the Government had proven beyond a reasonable doubt that 'but for' the ingestion of a substance delivered by the Defendant, Tyler Skaggs would not have died." ROA.983. Accordingly, for all but the conspiracy count's conduct elements, this Court's review should be de novo.

**b. The evidence is legally insufficient to support Kay's conviction for distributing a controlled substance resulting in death.**

**i. A rational jury could not conclude that Kay distributed fentanyl to Skaggs.**

Beginning with the distribution count and whether Kay had anything to give, the Government contends that a rational jury could infer that Kay purchased pills from "Ashley Smith" during the Angels' game the day before Skaggs's death. In Kay's opening brief, he acknowledged much of the evidence the Government highlights: he exchanged text messages with Smith that day; he put a pill in pitcher Matt Harvey's locker after the game; and following Skaggs's death, Smith deactivated her phone. Br. at 20-21, 32-34. But still, a rational jury could only speculate that Kay met up with Smith during the game to buy drugs. Cell-tower records show that Smith's phone connected only to Garden Grove towers

(ROA.2945-46), while Kay's phone connected only to towers near the Anaheim ballpark. ROA.2945-46. It's merely possible that between 3:06 and 3:46 p.m., when Smith's phone neither made nor received any calls, she drove the three or so miles to the ballpark. ROA.4521-22.

Arguing otherwise, the Government claims that "there certainly were no subsequent communications indicating that they were unable to meet or complete a transaction." Gov. Br. at 18. But the Government is mistaken. As Kay noted in his opening brief, Smith and Kay were still texting one another at 3:45 and 4:20. *See* ROA.2946. Moreover, Smith's deactivation of her phone hardly shows that she gave Kay the pills that caused Skaggs's death. Gov. Br. at 18. Just look at Skaggs's childhood drug-dealer friend, Christopher Leanos. He deleted oxycodone-seeking text messages from Skaggs after his death, and the Government's sure he was not the source. ROA.4729-31, 4756, 4760-61, 4764. At trial, Leanos explained that he deleted Skaggs's messages because he knew how it would have looked. ROA.4730-31. If, as the Government speculates, Kay and Smith were ongoing conspirators, she had every reason to fear the same. *See, e.g.,* Gov. Br. at 36.

The Government further contends that a rational jury could conclude that Kay delivered Smith's pills to Skaggs. In Kay's opening brief, he did not dispute that a rational jury could conclude that he visited Skaggs's hotel room after Skaggs

texted him to "come by." *See* ROA.1946, 1980-81. But a rational jury could not infer that he brought anything. To the contrary, the evidence supported that he arrived emptyhanded, and Skaggs offered *him* a crushed-up line, as Kay later confided to another team employee. ROA.4672-73.

At trial, the Government claimed that Skaggs never would have asked Kay to "come up to his room and party" and that Kay was Skaggs's only source. ROA.5306, 5312. But Harvey testified that Skaggs talked "here and there" about hanging out with Kay outside of work. ROA.4930-31. And Venmo records, relied upon by the Government elsewhere, indicate that the two were in the same fantasy football league. ROA.2897-99. Skaggs also had several other possible sources: his Santa Monica "friend," presumably Leanos (ROA.4931, 4945-46); Harvey himself (ROA.4926-31); Harvey's hometown dealer (ROA.4946-47, 4964-65); Rebecca Schoeny, a stadium caterer who used a fake name to text with Skaggs (ROA.1812-16, 4641, 4645, 4650); and Hector Vasquez, another Angels employee and, according to the Government, drug dealer. ROA.4694, 5346. Indeed, Harvey testified that when Kay was in rehab, Skaggs did not seem any different or come looking for a replacement dealer. ROA.4948. Skaggs also had ample opportunity to meet with someone else, either at the charter terminal at Long Beach Airport or

upon arriving at the hotel in Texas. ROA.3787, 4201, 4601, 4636, 5014, 5209-10, 5213.

On appeal, the Government argues that from the "come by" message alone, a rational jury could conclude that Kay delivered pills to Skaggs's hotel room. Gov. Br. at 19. The Government claims that "the jury's verdict was buttressed by" Kay's suspicious behavior after Skaggs's death. Gov. Br. at 19. And the Government again claims that Skaggs had no other sources and that he never would have invited Kay over just to party. Gov. Br. at 20, 22-23. Citing this Court's recent opinion in *United States v. Freeman*, 56 F.4th 1024 (5th Cir. 2023), the Government argues that this Court "has 'easily' affirmed a jury's verdict on less damning circumstantial evidence." Gov. Br. at 19-21.

Starting with Kay's suspicious behavior after Skaggs's death, the Government's argument misrepresents the record. It wasn't "Kay's story" that Skaggs "choked to death on some gummy bears." Gov. Br. at 20. That was a rumor going around the team after a bag of gummy bears was found next to Skaggs's body. ROA.4683-84. Kay merely passed it along. ROA.4684. But "affirmative false explanation[s] for [a] defendant's behavior can be evidence of guilt." Gov. Br. at 19 (quoting *United States v. Tenorio*, 360 F.3d 491, 495 (5th Cir. 2004)). Here, however, everyone agrees that Kay's guilty of distributing controlled substances.

The question is whether he's also guilty of distributing the controlled substance that caused Skaggs's death.

Considering evidence of flight, this Court explained that its probative value depends on inferring not just consciousness of guilt, but consciousness of guilt *about the crime charged. United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977). Here, "Kay's lying, deflection, and attempts to cover his tracks" (Gov. Br. at 19) do not reflect guilt about the charged offense. Again, Leanos deleted incriminating text messages after Skaggs's death, and the Government's sure he's innocent. Just as Leanos deleting text messages supports only that he distributed controlled substances, Kay's suspicious behavior supports only the same.

Furthermore, Skaggs's mother's and wife's unfamiliarity with Kay does not suggest that Skaggs never would have invited him over just to use. Gov. Br. at 20. Skaggs hid his drug use from his family. ROA.3862, 5100-02. Moreover, though Leanos and Schoeny denied selling Skaggs oxycodone, people often deny committing federal crimes. *Freeman*, with its lone possible suspect, therefore is nothing like this case. *See* 56 F.4th at 1026. There, the police found a gun in a field, physical evidence indicated it had only been there for "a brief time," and the only person nearby was the defendant, who had fled from the police and "could easily have thrown" the gun to its resting spot. *Id.*

In short, it's not that Kay asks this Court to reweigh the evidence in his favor. Gov. Br. at 24. Kay asks this Court to consider whether a rational jury could infer or merely speculate that he distributed fentanyl to Skaggs. Because it's the latter, this Court should enter a judgment of acquittal.

### ii.  If nothing else, a rational jury could not conclude that Kay gave Skaggs anything in Texas.

At trial, the Government's case was weakest when it came to venue, and on appeal, the Government appears to have abandoned its backup theory that Kay delivered on the flight from California to Texas. *See* ROA.5313-14, 5347-48; Gov. Br. at 24-26. But though the Government believes that Kay acquired pills in California, and players testified that his practice was to deliver to their lockers, and Harvey testified that Kay delivered a pill to his locker that afternoon, the Government argues that it "easily" proved that Kay distributed fentanyl in the Northern District of Texas. Gov. Br. at 24. "[T]he evidence," the Government contends, "need not 'exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." Gov. Br. at 25 (quoting *Moreno-Gonzalez*, 662 F.3d at 372). Thus, the Government reasons, it does not matter whether "the evidence . . . allowed room for the conclusion that [Kay] gave Skaggs pills in California . . ." Gov. Br. at 25.

Under even venue's preponderance standard, if a rational jury could only speculate that Kay distributed anything after landing in Texas, the evidence is legally insufficient. *See, e.g., United States v. Ezenwere*, 748 F. App'x 603, 604 (5th Cir. 2018) (per curiam). That's the case. Again, according to Government witnesses, Kay's practice was to leave pills in players' lockers, and under the Government's theory of the case, Kay had some three hours to do so on June 30, 2019. ROA.4972, 4992, 5311; *see* ROA.2955. Moreover, Skaggs's cell records indicate that he was in the locker room during the 3:06 to 3:46 p.m. window that Kay supposedly met with Ashley Smith. *See* ROA.1832-34, 3809-10. And Harvey testified that Kay left a blue pill in *his* locker on June 30. ROA.4934. Finally, and again, Harvey's testimony supported that Skaggs may have invited Kay to his room to use. ROA.4930-31.

The Government's correct, however, that its failure to prove venue no longer entitles Kay to an acquittal. Gov. Br. at 24-25. As Kay noted in his opening brief, the Supreme Court had, at the time, granted certiorari on the issue. Br. at 49-51; *see Smith*, 143 S. Ct. at 1601. The Court has since resolved the issue unfavorably to Kay, holding that the Constitution permits the retrial of a defendant following a trial in an improper venue and before a jury drawn from the wrong district. *Smith*, 143 S. Ct. at 1600. Accordingly, if this Court concludes that the Government failed

to prove only venue, this Court should reverse Kay's conviction and remand this case for retrial.

### iii.  A rational jury could not conclude that fentanyl killed Skaggs.

Finally, if nothing else, this Court should hold that the evidence is legally insufficient to support the jury's finding that fentanyl was the but-for cause of Skaggs's death. In its closing argument, the Government claimed that "every witness said it was the fentanyl," that "all of the medical professionals say it was the fentanyl" (ROA.5350), but in fact, the evidence was mixed. On the one hand, the forensic pathologist who performed the autopsy, Dr. Marc Krouse, and a toxicologist in his office, Dr. Robert Johnson, testified that they could not eliminate the possibility that Skaggs would have died from the oxycodone and alcohol in his system or say "'to a medical certainty' that the dosages of oxycodone and alcohol could not have been fatal." ROA.4212, 4221, 4250, 4449. On the other hand, a medical examiner in Dr. Krouse's office, Dr. Richard Fries, and the Government's expert-witness toxicologist, Dr. Stacey Hail, testified that fentanyl was the but-for cause of Skaggs's death. ROA.4341, 5049, 5076. But Dr. Fries and Dr. Hail also hedged. Dr. Fries acknowledged that he did not challenge Dr. Krouse's conclusion when they met for a "Critical Case Review," and he conceded that Dr. Krouse "knows what he's talking about." ROA.4327, 4348-49. Similarly, Dr. Hail

acknowledged that Dr. Johnson was a credible witness—she relied on his notes to form her opinion—and she did not disagree with Dr. Krouse. ROA.5055, 5072. Ultimately, Dr. Hail could not "conclusively rule out the possibility that Tyler Skaggs would have died from alcohol and oxycodone that night." ROA.5054.

The Government's brief does not address Dr. Fries's equivocation, but the Government argues that Dr. Hail's testimony was definite. In context, the Government contends, she merely "acknowledge[ed] that oxycodone combined with alcohol *can* kill a person." Gov. Br. at 28 (emphasis added) (citing ROA.5075-76). The Government further claims that, if anything, Dr. Krouse's and Dr. Johnson's testimony supported the verdict. Gov. Br. at 28-29.

But that's not what Dr. Hail said. She affirmed that she could not "conclusively" rule out the possibility that Skaggs would have died from alcohol and oxycodone alone:

```
16   Q    (BY MR. WYNN)  You cannot conclusively rule out the
17   possibility that Tyler Skaggs would have died from alcohol and
18   oxycodone that night, can you?
19   A.        Correct.
20   Q.        You cannot, correct?
21   A.        Correct.
```

ROA.5054. Moreover, Dr. Krouse's and Dr. Johnson's testimony hardly helped the Government. Maybe Skaggs's "ingestion of fentanyl made his death '[a] much

greater probability.'" Gov. Br. at 28 (quoting ROA.4250). And maybe, from a "tox

perspective," the fentanyl in Skaggs's body was "much more significant." Gov.

Br. at 29 (quoting ROA.4445). But again, Dr. Krouse and Dr. Johnson were not

sure. ROA.4212, 4221, 4250, 4449. And as the Government acknowledges, its

burden "requires proof that the harm would not have occurred in the absence of—

that is, but for—the defendant's conduct." Gov. Br. at 27 (quoting *Burrage v.

United States*, 571 U.S. 204, 211 (2014)).

The Government further contends that "[s]trong circumstantial evidence . .

. supported the verdict": (1) the lack of norfentanyl, the byproduct of passing

fentanyl, in Skaggs's blood; (2) Skaggs's body's positioning on his bed, indicating

he suffered from central nervous system depression; and (3) that Skaggs's cell

phone was nearby, ostensibly suggesting that he died not long after sending his final

text message, which came 15 or so minutes after he texted Kay to come by. Gov. Br.

at 29-30; *see* ROA.1898, 1902. But the lack of norfentanyl may reflect that Skaggs

ingested fentanyl and fully metabolized it. ROA.4332. Moreover, like fentanyl,

oxycodone and alcohol are central nervous system depressants. ROA.4353, 4447.

And a rational jury could only speculate that a lack of cellphone activity meant

Skaggs died not long after sending his last text. Gov. Br. at 30. He may have just

been getting high. He may have been eating gummy bears. *See* ROA.4684, 5681.

Finally, here, too, the Government compares this case to one that is not particularly similar. Here, it's *Thompson*, where according to the Government, this Court affirmed "a jury's but-for-causation finding . . . on materially similar evidence." 945 F.3d at 345; *see* Gov. Br. at 30. But the appellant there argued that the evidence was insufficient because he distributed heroin to a middleman who "ultimately chose the heroin injected into [the victim]." *Id.* And he challenged the nature of the but-for test itself, arguing that "heroin had to be the 'only' cause of [the victim's] injuries." *Id.*; *cf. United States v. Ramos-Delgado*, 763 F.3d 398, 402 (5th Cir. 2014) (explaining that an event might have "many but-for causes"). The question was not whether the Government proved that one substance rather than another caused the victim's injuries. *Id.*

Just as a rational jury could only speculate that Kay distributed a controlled substance to Skaggs, a rational jury also could only speculate that fentanyl was the but-for cause of his death. Accordingly, if nothing else, this Court should modify the judgment to reflect a conviction for the lesser-included offense and remand for resentencing. *See Burrage*, 747 F.3d at 998; *see also Castro-Trevino*, 464 F.3d at 543.

### c. The evidence is legally insufficient to support Kay's conspiracy conviction.

#### i. The record is devoid of evidence that Kay conspired with anyone to distribute drugs.

"In a conspiracy to possess with intent to distribute controlled substances, the object of the conspiracy is for the co-conspirators to profit from the purchase and selling of controlled substances." *United States v. Owens*, 724 F. App'x 289, 295 (5th Cir. 2018) (quoting *United States v. Niamatali*, 712 F. App'x 417, 422 (5th Cir. 2018) (citing *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995); *United States v. Romans*, 823 F.3d 299, 310 (5th Cir. 2015))). Kay did not profit at all (ROA.4999), and he certainly did not conspire to do so with million-dollar athletes. Nor did he conspire with his suppliers, many of whom were anonymous internet users. As for Ashley Smith, specifically, the Government acknowledged in its opening statement that she "just started communicating [with Kay] about a week before" Skaggs died. ROA.3647. And as for Hector Vasquez, the evidence showed only that they talked to each other and Smith. ROA.4536-42, 4829. The evidence therefore is legally insufficient to support Kay's conspiracy conviction, too. *See* 21 U.S.C. § 846.

Insisting that "Kay conspired with the people to whom he sold opioids, including Skaggs," the Government argues that it does not matter whether he or the players profited. Gov. Br. at 33-35. In any event, the Government claims, Kay did: In April 2018, Skaggs sent him $1,500 via Venmo, but Kay sent Shannon Diaz just $1,110. Gov. Br. at 35 (citing ROA.2900).

As with so much of the Government's case, the Venmo evidence allows only for speculation. It's necessary here to go into a bit more detail. Skaggs did not pay Kay $1,500 across three transactions in "late April 2018." Gov. Br. at 35. Skaggs paid Kay $400 on April 25, $500 on May 1, and $600 on May 9 (he also paid Kay $150 on May 18, but the Government seems to acknowledge that this was separate). ROA.2900. Meanwhile, Kay paid Diaz $300 on April 23, $250 on April 24, $400 on April 25, and $160 on April 26. ROA.2900. The timeline therefore was as follows:

| April 23 | | Kay → Diaz $300 |
|---|---|---|
| April 24 | | Kay → Diaz $250 |
| April 25 | Skaggs → Kay $400 | Kay → Diaz $400 |
| April 26 | | Kay → Diaz $160 |
| April 27 | | |
| April 28 | | |
| April 29 | | |
| April 30 | | |
| May 1 | Skaggs → Kay $500 | |
| May 2 | | |

| May 3 | | |
|---|---|---|
| May 4 | | |
| May 5 | | |
| May 6 | | |
| May 7 | | |
| May 8 | | |
| May 9 | Skaggs → Kay $600 | |

Of course, it's possible that all of Skaggs's payments were for pills sourced from Diaz, and Kay pocketed $390. But like the May 18 payment, the May 1 and May 9 payments appear to have been for pills from a different seller—one who did not accept Venmo. Even if the May 1 payment was for Diaz, Skaggs paid less than Kay paid her.

Moreover, it does matter whether Kay and the players entered into an agreement to profit off the distribution of drugs. Again, "[i]n a conspiracy to possess with intent to distribute controlled substances, the object of the conspiracy is for the co-conspirators to profit from the purchase and selling of controlled substances." *Owens*, 724 F. App'x at 295 (quoting *Niamatali*, 712 F. App'x at 422 (citing *Morris*, 46 F.3d at 415; *Romans*, 823 F.3d at 310)).

As for Kay's suppliers, the Government highlights Venmo, cell-tower, and cellphone records as "proving" that Kay conspired with Smith, Hector Vasquez, Shannon Diaz, and others. Gov. Br. at 31-32. In his opening brief, Kay noted that "a buyer-seller relationship, without more, will not prove a conspiracy," even where the buyer purchases for resale. Br. at 43 (quoting *United States v. Ausbie*, No. 21-50189, 2022 WL 831807, at *1 (5th Cir. May 21, 2022)). But "[i]n this Circuit," the Government responds, "the [buyer-seller] exception merely 'prevents a *single* buy-sell agreement, which is necessarily reached in every commercial drug transaction from automatically becoming a conspiracy to distribute drugs.'" Gov. Br. at 35-36 (quoting *United States v. Delgado*, 672 F.3d 320, 333 (5th Cir. 2012) (emphasis added)).

That "a single buy-sell agreement cannot constitute a conspiracy," *United States v. Escajeda*, 8 F.4th 423, 426 (5th Cir. 2021), does not mean that a repeated agreement *must* constitute a conspiracy. Again, as Judge Dennis explained in his dissenting opinion in *Delgado*, "the government must establish not only that the seller knew the buyer intended to engage in further distribution, but that the seller intended and agreed to the shared intent of the buyer to further distribute." 672 F.3d at 365 (Dennis, J., dissenting) (collecting cases). "For example, evidence that a defendant purchased drugs on consignment would provide 'strong evidence' of

membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship." *United States v. Holloway*, 377 F. App'x 383, 386 (5th Cir. 2010) (per curiam) (quoting *United States v. Posada–Rios*, 158 F.3d 832, 860 (5th Cir. 1998)).

Here, the record is devoid of evidence that Kay and his sellers shared any conspiratorial purpose. He did not promote his sellers' drug distribution ventures, they did not help him create a distribution system, and there is no evidence that anyone fronted Kay. On Count One, too, the evidence is legally insufficient to support the jury's verdict, and this Court should enter a judgment of acquittal.

### ii. The Government failed to prove that any conspiracy was still ongoing when Kay tried to avoid suspicion.

If nothing else, here, too, this Court should reverse Kay's conviction because the Government failed to prove venue. Again, (1) the Government did not show that Kay distributed anything in Texas. And (2) after Skaggs died, any conspiracy ended. Any attempt to "avoid detection," be it by lying to the police, telling Harvey they needed to stick together, or communicating with Smith on her new phone (Gov. Br. at 37-38), therefore was not in furtherance of any conspiracy. *See Romans*, 823 F.3d at 310 (explaining venue requirement in conspiracy cases).

Like Kay, the Government relies on its earlier briefing on the former point. Gov. Br. at 37; *see* Br. at 47. On the latter point, the Government ignores Kay's

brief, contending that "the indictment charged a conspiracy through July 2019" and that "the jury saw how Kay was still trying to source opioids days after Skaggs's death." Gov. Br. at 38 (citing ROA.563, 2821).

There is therefore little more to say. A rational jury could not conclude that Kay distributed anything in Texas. The indictment is not evidence. *United States v. Ross*, 58 F.3d 154, 160 n.10 (5th Cir. 1995). And there is no evidence that Kay, an addict, was trying to source for resale. Certainly, there is no evidence that he was looking to profit. *See Niamatali*, 712 F. App'x at 422 (citing *Morris*, 46 F.3d at 415; *Romans*, 823 F.3d at 310). At most, then, the Government proved that Kay's acts of concealment were "desperate attempts to cover up after the crime begins to come to light," not acts in furtherance of an ongoing conspiracy. *Grunewald v. United States*, 353 U.S. 391, 403 (1957) (Jackson, J., concurring). Because the evidence therefore is legally insufficient to support the jury's venue finding, this Court should reverse the judgment and remand for retrial.

## 2. The Government's closing arguments were repeatedly improper, warranting reversal under the cumulative-error doctrine.

### a. The Government falsely claimed that there was no evidence of deleted text messages between Skaggs and a drug-dealer friend.

In his second ground in his opening brief, Kay identified six improper remarks during the Government's closing arguments. Individually, each remark

casts serious doubt on the correctness of the jury's verdict. *See United States v. Holmes*, 406 F.3d 337, 356 (5th Cir. 2005). But together, the improper arguments denied Kay his constitutional right to a fair trial, calling for reversal under the cumulative-error doctrine. *See United States v. Herman*, 997 F.3d 251, 275 (5th Cir. 2021) ("[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.") (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)).

The Government in response argues that each comment was fine and that, regardless, the evidence of guilt was "substantial." Gov. Br. at 59. Beginning with its claim that there was no evidence of deleted text messages between Skaggs and his drug-dealer friend, Christopher Leanos (ROA.5342), the Government does not dispute that the evidence shows that Leanos deleted drug-seeking messages from Skaggs. Gov. Br. at 41-43. But the Government contends that "[i]n context," it accurately argued that there was no evidence that Skaggs's stepbrother, Garet Ramos, deleted the messages from Skaggs's phone. Gov. Br. at 41-42. Though Southlake Police Sergeant Jonathan Macheca gave Skaggs's phone to Ramos, the Government emphasizes that Macheca did not see him delete anything. Gov. Br. at 42. The Government further notes that Secret Service Analyst Stefan Hare found

no evidence of deleted messages on Skaggs's phone. Gov. Br. at 43. And though Leanos testified that Skaggs texted him looking for oxycodone, but no such message was found on Skaggs's phone, the Government argues it's a "logical leap" to infer that Ramos deleted the message. Gov. Br. at 43.

It's not a leap. Leanos testified that a week or two before Skaggs's death, Skaggs texted him looking for oxycodone, and law enforcement found no such message on Skaggs's phone. ROA.4729-30. Someone must have deleted the text, and outside of law enforcement, only Ramos handled Skaggs's phone after his death. ROA.4778-49. Macheca admitted that he could see the phone only "[m]ost of the time" Ramos handled it (ROA.4778-79), and Ramos later admitted deleting or trying to delete photos. ROA.4761, 4765. Finally, Hare testified only that he did not uncover any deleted *text* messages. ROA.4082, 4084, 4094, 4096-97, 4100-02, 4145-46. Skaggs also used WhatsApp, Snapchat, and Instagram, exchanging at least one message with Leanos on the latter. ROA.4147-51. No matter what the prosecutor was referring to, then—whether it was evidence that Leanos or Ramos deleted text messages—she misstated the evidence.

### b. The Government falsely claimed that the evidence showed that Kay was Skaggs's only source for drugs.

Similarly, the Government does not now dispute that Kay was not Skaggs's only source for drugs (Gov. Br. at 44-45; *cf.* ROA.5306), but the Government

claims that, in context, it accurately argued that "Kay was the only source for *blue,*

*30-miligram oxycodone pills*—like the fentanyl-counterfeit pill that killed Skaggs."

Gov. Br. at 44 (emphasis in original). But again, no matter what the Government

meant, the claim is false. Pitcher Matt Harvey, who admitted providing Skaggs

with pink pills, testified that Skaggs had another source for pills, generally, without

reference to color or weight. ROA.4931. Harvey later affirmed that Skaggs had a

source in Santa Monica (presumably, Leanos), again without reference to color or

weight. ROA.4945.

To be sure, Leanos denied dealing oxycodone altogether. ROA.4729; *see*

Gov. Br. at 44-45. But even if that were credible, we do not know that he was the

source to whom Harvey referred. To the contrary, Harvey had never heard of

Leanos. ROA.4946. The Government also misplaces its weight on the idea that a

pink source would not provide a blue. As Harvey explained, when he reached out to

a drug dealer at Skaggs's request, he was not "specific as to Percocets versus blue

B's or anything like that." ROA.4947. He just asked, "can I get some oxy"?

ROA.4947.

> **c. The Government falsely claimed that "every witness said it was the fentanyl" that was the but-for cause of Skaggs's death.**

In his opening brief, Kay further objected to the prosecutor's claim that "every witness said it was the fentanyl" that was the but-for cause of Skaggs's death. Br. at 56-57; *see* ROA.5350. Again, the witnesses were mixed.

In response, the Government summarizes the witnesses' testimony and contends that the prosecutor merely "argued the natural inference therefrom that, but-for ingesting fentanyl, Skaggs would have survived." Gov. Br. at 49. But that's not what the prosecutor argued. She falsely claimed that "every witness said" fentanyl was the but-for cause of Skaggs's death. ROA.5350.

### d. The Government falsely claimed that the evidence showed that Kay was in Skaggs's room when he died.

The Government's fourth improper argument was the most inflammatory. There, the Government falsely claimed that the evidence showed that Kay was in Skaggs's room when he died. ROA.5351. As the Government later put it at sentencing: "He had to walk by Tyler Skaggs's lifeless body, grab the wrong key, and then go get a new one, and then he went back to his room, and then later he went and had barbecue . . ." ROA.5402. Maybe, the Government speculated, Kay knew "Tyler was in distress and he freaked out and decided to save his own skin and his own job and just waited it out until he thought it was free and clear to leave." ROA.5401. Or maybe Kay "was so high himself that he didn't care that Tyler was in distress . . ." ROA.5401.

In its brief, the Government does not dispute that Kay may not have been in the room when Skaggs died. Gov. Br. at 51. The Government dismisses this as an "alternative inference," however, and maintains that the "evidence led to the natural, logical conclusion that Kay went to Skaggs's room, delivered the pill that caused his rapid death, was there when Skaggs died, and did not return to his room until the next morning." Gov. Br. at 50-51.

Again, much of the pointed-to evidence shows only that Kay visited Skaggs's room, a fact Kay does not dispute. But as for whether Kay was there when Skaggs died, the Government returns to Kay's room key. Gov. Br. at 50. Like at trial, the Government emphasizes that key data shows Kay entering his room just twice, around 11:30 p.m. and 8:30 a.m. Gov Br. at 50; *see* ROA.2707, 5351. And in any event, the Government again infers from Skaggs's phone activity that he died just minutes after Kay said he would come by. Gov. Br. at 50.

As addressed in Section 1(b)(iii), Skaggs's text messages allow only for speculation as to his time of death. And as explained in Kay's opening brief, key data cannot reliably document guests' entries in a hotel with door-propping locks. Br. at 59. Again, the district court appears to have recognized as much. It overruled the Government's objection to the Presentence Report's statement, "[i]t is

unknown whether Kay was still in the room with Skaggs at the time he passed."

ROA.3004, 3019-20, 5379. Here, again, the Government went too far.

### e. The Government vouched for its witnesses' credibility.

Four of Skaggs's former teammates testified for the Government that Kay provided the group with drugs. ROA.4930, 4933-34, 4964-65, 4971, 4990-94, 5010. In its rebuttal closing argument, the Government then vouched for the witnesses' credibility:

> You had all of these players come in and talk about it, and talk about the drugs they got from Eric Kay. I don't think there's any—there's no question that that system is broken, MLB system is broken, that they have to play, and they have to do whatever it takes to play.
>
> And you watched these people march in here, and they didn't want to do it, *but they stood up and they told the truth*, and they also told you it was very common, but these guys told you what was going on.

ROA.5345 (emphasis added); *see United States v. Gracia*, 522 F.3d 597, 601 (5th Cir. 2008) ("[A] personal assertion by a prosecutor of a government witness's credibility is impermissible.").

Contorting itself, the Government now argues that it was not commenting on the players' truthfulness. Gov. Br. at 52. Regardless, the Government contends, everyone agreed that Kay sold the players' drugs. Gov. Br. at 52-53. And if nothing else, the prosecutor's "use of the word 'truth' was a single, isolated statement." Gov. Br. at 54.

But the players did not just testify that Kay got them drugs. As Kay set out in his opening brief, the Government pointed to the players' testimony in support of its plainly erroneous argument that Skaggs had no other source for oxycodone. ROA.5312. As to the conspiracy count, the Government cited the players' testimony in support of its misplaced argument that Kay conspired with them to distribute controlled substances. ROA.5302-03. The Government's plainly improper vouching for their credibility therefore was improper.

### f. The Government compared Kay's counsel to an octopus.

Finally, the Government contends that it was merely mocking defense counsel's argument when it compared him to an octopus, pointing to this Court's decisions in *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), and *United States v. Neal Uy Lim*, 500 F. App'x 323 (5th Cir. 2012). Gov. Br. at 55-57. In *Bernard*, this Court found no error in a prosecutor's rebuttal argument that the defense "tr[ied] to get someone on this jury to follow down a rabbit trail and take a red herring" and would "try[] to convince you it's midnight outside right now." 299 F.3d at 487-88. In *Neal Uy Lim*, this Court found no error in a prosecutor's argument that the defense's argument was a "smoke screen." 500 F. App'x at 326.

As Kay acknowledged in his opening brief, the Sixth and Eighth Circuits have, for the same reason, found no error in prosecutors' octopus arguments. Br. at

63 (citing *Sinisterra v. United States*, 600 F.3d 900, 909–10 (8th Cir. 2010); *Key v. Rapelje*, 634 F. App'x 141, 149 (6th Cir. 2015)). But the Government did not merely argue that Kay's attorney tried to confuse the jury. The Government claimed that he behaved like an animal in so doing. ROA.5341. The district court erred in overruling Kay's objection. *See United States v. Rodriguez-Lopez*, 756 F.3d 422, 433–34 (5th Cir. 2014) ("We have repeatedly chastised federal prosecutors for making improper remarks in closing arguments—for example, for . . . attacking the character of defense counsel").

### g. The Government's improper arguments denied Kay his constitutional right to a fair trial.

Kay argued in his opening brief that, taken together, the Government's improper comments denied him his constitutional right to a fair trial. Br. at 64-68; *see Herman*, 997 F.3d at 275 ("Put another way, '[t]he [cumulative-error] doctrine justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial.'"). In response, the Government argues that the comments were all appropriate, so there's nothing to accumulate. Gov. Br. at 59 (*United States v. Stanford*, 823 F.3d 814, 843 (5th Cir. 2016)). And even if the comments were improper, the Government contends that the "substantial evidence of guilt" prevents this from being "the unusual case in

which synergistic or repetitive error" rendered a trial fundamentally unfair. Gov. Br. at 59 (quoting *Delgado*, 672 F.3d at 344).

Again, then, there is little left to add. As set out in the preceding pages, the Government's closing arguments were repeatedly improper. And far from overwhelming, the evidence was legally insufficient. The prosecutors' closing argument misstatements, improper vouching for Government witnesses, and attack on Kay's counsel "so fatally infect[ed] the trial that they violate[d] the trial's fundamental fairness." *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009).

## Conclusion

Because the evidence is legally insufficient to support the offenses' conduct elements, this Court should enter a judgment of acquittal. *See, e.g., Bellew*, 369 F.3d at 456–57. Failing that, because the Government failed to prove that Kay committed the offenses in the Northern District of Texas and its closing arguments were repeatedly improper, this Court should reverse the district court's judgment and remand this case for a new trial. *See Smith*, 143 S. Ct. at 1600; *Herman*, 997 F.3d at 275. If nothing else, because the Government failed to prove that fentanyl was the but-for cause of Skaggs's death, this Court should modify the judgment to reflect a conviction for the lesser-included offense and remand for resentencing. *See Castro-Trevino*, 464 F.3d at 543; *Burrage*, 747 F.3d at 998.

Respectfully submitted,

/s/ Brett Ordiway

Brett Ordiway
Texas Bar No. 24079086
brett@udashenanton.com

Madison McWithey
Texas Bar No. 24119481
madison@udashenanton.com

Udashen|Anton
8150 N. Central Expressway
Suite M1101
Dallas, Texas 75206
214-468-8100
214-468-8104 (fax)

## CERTIFICATE OF SERVICE

On September 1, 2023, I filed this brief via the Court's ECF system and served a copy to Appellee's counsel.

/s/ Brett Ordiway

BRETT ORDIWAY

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 6,496 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Equity, a proportionally spaced typeface, using Microsoft Word, the same program used to calculate the word count.

/s/ Brett Ordiway

BRETT ORDIWAY